## Case No. 17,733.

### WILLIAMS v. REED.

[3 Mason, 405.] [1]

Circuit Court, D. Maine. May Term, 1824.

ATTORNEY AND CLIENT—DISCLOSURE OF ADVERSE RETAINER—NEGLIGENCE—RATIFICATION OF PROCEEDINGS BY CLIENT—APPRAISEMENT OF REAL ESTATE.

1. An attorney is bound to disclose to his client, if he has any adverse retainer, which may affect his own judgment or his client's interest. But the concealment of the fact is not a necessary presumption of fraud.

2. If a creditor has several debts, some of which are secured by mortgage and some not, it is not gross negligence to unite them all in a single suit at law, and so take a single judgment therefor; and if in such case the execution issuing on the judgment is satisfied in part only, a court of equity will apply the monies received on the execution in the first instance to extinguish such parts of the debt and judgment as were not secured by mortgage.

3. A ratification of the proceedings of an attorney in a suit is not valid to bind the client, unless it is made with a full knowledge of all the material facts.

4. It seems, that an attorney at law is not bound to be personally present, or personally to coöperate with the appraisers, who, under the laws of Maine, are authorized to set off real estate by appraisement to satisfy an execution.

[5. Cited in Elmore v. Johnson, 143 Ill. 534, 32 N. E. 419, to the point that in suits to set aside contracts between parties standing in a confidential relation to each other, although the defense of laches is not usually regarded with favor, yet the application must be made within a reasonable time, to be judged by the court, under all the circumstances of the case.]

This was a bill in equity against the defendant [Isaac G. Reed], who was an attorney and counsellor at law, for fraudulent misconduct in respect to the plaintiff [John D. Williams], who was his client. The bill, as amended, was in substance as follows: "That on the 8th of March, 1820, one James W. Head of Warren, in the state of Maine, was indebted to the plaintiff in four several notes of hand. viz. one dated November 20th, 1812, for $7000; and three others dated December 16th, 1818, for $3000, $1000, and $3338.76 cents, all of them on demand with interest; that before this, viz. September 3d, 1813, Head mortgaged to the plaintiff, as collateral security for the note of $7000, his house and twenty-one acres of land in Warren; also a landing bounded on George's river; that afterwards on June 3d, 1819,

Head mortgaged to plaintiff as security for the notes of $3000 and of $1000, a farm in Union of 160 acres, more or less, and also 114 rods of land in Warren, called the Lime-kiln and Landing; that March 8th, 1820, the plaintiff was at Waldoborough with his notes and mortgages, and then and there did for a certain fee retain the defendant, who was a counsellor and attorney at law, who thereupon engaged to assist plaintiff, and as far as practicable to obtain security for said debts; that the defendant obtained of Head on the 10th of March, 1820, another mortgage of other lands in Warren, (including, as the bill alleges, the lands described in the two former mortgages) as farther security for the aforesaid notes of $7000, $3000, and $1000; that at that time the aforesaid mortgages were good and ample security for the greater part, but not entirely sufficient for the whole amount of said several demands, and that Head was then able and willing to give the plaintiff, as farther security, certain good bonds and notes to the value of $8000, which the defendant ought to have taken, whereby the plaintiff would have been fully secured. Yet that the defendant contriving to defeat and defraud the plaintiff, and to prefer other creditors of Head, did neglect to demand and receive of Head the said bonds and notes of hand, and to maintain and keep the collateral security aforesaid on said deeds of mortgage, but on the contrary he sued Head on the whole of said demands. and recovered judgment at April term, 1820, C. C. Pleas at Wiscasset, for $14,402.40 debt, and $29.04 costs, and sued out an execution on that judgment; that on the 31st of May, 1820, the defendant, with the same fraudulent design, caused the execution to be levied, and, as to the greater part, satisfied on sundry small and detached parcels of real estate, lying in various places. and distant from each other, and of no value to plaintiff; but which, by defendant's procurement, were estimated and appraised at the sum of $8785.27, discharging plaintiff's judgment for that sum, which is wholly lost to plaintiff: that there was also the further sum of $1145.58 received in part satisfaction of said judgment, which ought to have been, in equity, applied in part payment of the note of $3338.76, which was not secured by mortgage; and that by the defendant's fraudulent, false, and unfaithful conduct. while professing to act as plaintiff's attorney, there now remains unsatisfied of the plaintiff's judgment only $4500.84, which is all that the mortgages now stand for, although the estates mortgaged were sufficient security for $10.000; that the defendant with fraudulent design &c. to injure plaintiff and prefer other creditors, caused Head's right in equity in the mortgaged estates to be attached and sold to satisfy the claims of other creditors of Head; and conspiring with other persons the same was so sold for $3000, which was much less than its value; that the defend-

ant concealed his intentions of thus sacrificing the interests of plaintiff, and never notified him of the intended levy on the small parcels of land; that the defendant pretends, that this was done by the plaintiff's instructions, which is false; that the defendant pretends, that the mortgaged estate is worth only $4500.84, which is also false, they being worth $10,000. The bill therefore prays, that defendant may be held to answer, and also prays, that defendant may be compelled to take the real estate appraised at $8785.27 to himself, and pay plaintiff the amount of his judgment, and the bill concludes with a prayer for general relief," &c.

At October term, 1822, the plaintiff filed an amendment of his bill, as follows: "And now the said orator by leave of the court here first obtained, by way of amendment of the bill aforesaid, further charges and says, that the said Reed unskilfully, improperly, and against the duty, which he owed to your orator, joined in one suit all the notes of hand against the said James W. Head, which he had received of your orator for collection as aforesaid; and on all the demands thus improperly joined, said Reed afterwards recovered an entire judgment as aforesaid; thereby confounding those notes for which security by mortgage had been taken with those for which there was no security, and rendering it difficult or impracticable for your orator to apply any security or payment, which he might afterwards obtain, to those of your orator's said demands for which no security had been taken; and so exposing your orator's security by said mortgages to danger, by reason of any partial satisfaction of said judgment, which he might obtain by other means. And your orator further charges and says, that on the 6th day of March in the year of our Lord 1820, after your orator had had a confidential communication and conversation with the said Reed of and concerning his said debts, and the obtaining security thereof, but before said notes were deposited with the said Reed for collection as before stated, the said Reed, as attorney to one Joshua Head, caused an attachment to be made on divers parcels of real estate of the said James W. Head, situate in Union. Thomaston, and Warren, to wit, the same fifteen small detached parcels of real estate, on which said Reed caused the execution of your orator to be extended, in a suit in which said Joshua Head was plaintiff against the said James W. Head; of which proceeding the said Reed neither then nor afterwards gave your orator any notice. And the said Reed caused said action to be continued in court till the term thereof in the month of April, A. D. 1821, when judgment was entered therein for the plaintiff for the sum of two thousand and thirty-seven dollars, debt or damage, and costs of suit, taxed at twenty-two dollars and seventy-four cents. And the said Reed having fraudulently and improperly as afore-

said, on said thirty-first day of May, A. D. 1820, caused the execution of your orator against said James W. Head to be extended on said detached parcels of real estate, although said parcels were, as said Reed then knew, subject to the attachment made in said suit of Joshua Head against said James W. Head, caused the execution, which was issued on the judgment rendered in the last mentioned action to be levied on said James W. Head's equity of redemption of said lands before by him mortgaged to your orator for security of his demands aforesaid, and afterwards caused the same right in equity to be sold for the sum of two thousand and one dollars, being within five cents of the precise amount of said execution against said James W. Head. So that, in fact, said Reed fraudulently procured said last mentioned debt to be paid in cash out of the land mortgaged to your orator, and procured to your orator an illusory satisfaction of a part of his said judgment, by extent on sundry small parcels of land of little or no value. as aforesaid. So that your orator, who had the first right to the security of said mortgaged estate, has lost the same; and said Reed has obtained it for said Joshua Head; and said Joshua Head. who had only a security on said small detached parcels of real estate by his said attachment, has thrown the same on your orator, and has obtained his debt aforesaid in money out of the property and estate before mortgaged to your orator. And to the end that justice may be done in the premises, your orator humbly prays, that said Reed may be required further to answer upon his corporal oath, whether he had with your orator on said sixth day of March, A. D. 1820, or at any time previous thereto, and at what time, a confidential communication of and concerning his said demands, and the obtaining security for the same."

The defendant's answer, saving exceptions to the bill. admitted, that on the 8th of March, 1820, the plaintiff did retain him, professionally. to obtain better security and payment of Head's notes. That on the 11th of March, 1820, in pursuance of the plaintiff's orders, the defendant did obtain a mortgage of a store and land in Warren, as security for the notes of 7000, 3000. and 1000 dollars. That on the 8th of March, 1820, the plaintiff instructed the defendant in writing, that if Head would not give security, to attach all the property he could find, and secure the demands in the best way possible; to get the start of others, if any were about to attach, if he could; and to manage the whole business as if the property were his own. And on the same day the plaintiff verbally requested the defendant to attach all the real estate of Head, and keep it secret till he could ascertain whether Head would give good additional security to the amount of 8000 dollars. That the defendant, in the firm belief that Head would not and could not give other se-

-curity, and that other creditors were about to attach, to secure the plaintiff, on the 9th of March, 1820, in pursuance of the plaintiff's instructions, attached, secretly, all Head's real estate. But Head would give no other additional security, except the aforesaid mortgage, given March 10th, except that afterwards, March 13th, 1820, the defendant obtained of Head a deed of mortgage, executed by James Crawford to Head, November 27th, 1816, of 96 acres of land in Warren, for $1053.29, payable in five years, with interest annually; and another mortgage by David Y. Kellock to Head, dated April 24th, 1819, of 80 acres, in Warren, for $171.85, payable 'n two years, with interest; and another mortgage by Samuel Weston to Head, dated January 11th, 1808, of 3 acres and some rods, for $228.31, and interest; and notes of hand for each of said sums. These mortgages were all assigned by Head to the plaintiff as farther security, as well of the fourth note of $3328.76, as of the other three; which being all the security Head would give, the defendant caused all his personal property to be attached for the plaintiff. and gave the plaintiff information thereof by letters of 13th and 16th of March, 1820. and in answer thereto received in writing the plaintiff's full and entire approbation. That the defendant was never instructed by the plaintiff not to insert the whole of his said notes of $7000, $3000. $1000, $3338.76 in the writ of attachment. That the defendant acted with good faith, and in pursuance of his instructions, as if the debts were his own. That on March 9th, 1820, the defendant commenced a suit against Head on the whole of the four notes, attached all his real and personal estate known to the defendant, and prosecuted the suit to final judgment for debt and costs as alleged in the bill. The answer admitted, that the defendant caused execution to be extended on several small and detached parcels of real estate in different places, distant from each other, and caused them to be set off on appraisement of men chosen regularly by the parties, at $8391.56. That the personal estate sold for $1220.28 and the costs of levy, $193.99 being deducted, it left the execution satisfied in part, for $9417.85, and unsatisfied for the residue, viz. $5013.77. It denied, that the land was set off at $8785.27, and that the judgment was reduced to $4500.84, as alleged in the complaint. It alleged, that the defendant obtained all the property he could, and duly notified the plaintiff of all his proceedings in the premises. That before the day of his retainer by the plaintiff, viz. March 6th, 1820, all Head's real estate mortgaged to the plaintiff, and all his other parcels of estate afterwards attached for the plaintiff, were attached on a writ of that date by one Joshua Head, for a debt of about $2000. That judgment was recovered April term, 1821, of the court of common pleas at Wiscasset, for the debt, $2037.33, and costs taxed at $22.74. That execution issued thereon. That the de-

fendant, as Joshua Head's attorney, May 26th, 1821 (the attachments being then in force,) caused the right in equity to be seized and advertised, and, June 26th, 1821, sold at public vendue, to one James Head, of Warren, the highest bidder, for $2101, which was its full value. That before his retainer by the plaintiff, viz. March 6th, 1820, the defendant was retained as counsel by Joshua Head, to collect his debt of James W. Head; and for three years preceding, he had been retained as the general counsellor of Joshua Head, which the plaintiff well knew. That only upon this retainer of Joshua Head did he counsel or assist any other creditor of J. W. Head. It denied the defendant's knowledge of any other attachment except Joshua Head's, or that he assisted any other creditor. It denied, that the three mortgages given to the plaintiff were good and ample security for a great part of his demands, and that he could have obtained of J. W. Head any different, further, or greater security than the mortgages aforesaid. It denied, that the mortgages were worth, at the time of his retainer, more than the balance of the plaintiff's execution, viz. $5013.77. It alleged, that the plaintiff, by his letters of March 15th, 17th, and 21st, and of April 10th, 1820, estimated his demands, securities, and attachments against J. W. Head at $5000 less than their nominal value. And, lastly, it denied all unlawful combination, and traversed the knowledge as true, of any other matter, &c.

To this there was a general replication. That notwithstanding any thing in the defendant's answer, the matters and things in the plaintiff's bill of complaint were true, as therein alleged, et hoc paratus, &c.

Greenleaf & Mason, for plaintiff, contended:

1. That the defendant, when retained by the plaintiff, fraudulently, and contrary to his duty, concealed from the plaintiff the material facts, that he had been previously retained· by Joshua Head, and had instituted a suit for him, and advised him to anticipate the plaintiff, in getting security; and that the defendant afterwards, although specially required to give all information in his power, concealed from the plaintiff the measures taken to secure Joshua Head's debt, whereby the plaintiff was deprived of the opportunity, which he ought to have had, of judging for himself, whether he would entrust the management of his business to the defendant under such conflicting engagements.

2. That the defendant unskilfully, and contrary to his duty, joined in one suit and judgment the plaintiff's debts secured by mortgages, with that which was not secured, and thereby rendered it difficult, if not impracticable, for the plaintiff to apply subsequent payments or securities exclusively to that not secured.

3. That the defendant, with intent of preferring Joshua Head to the plaintiff, caused the plaintiff's execution to be extended on

fifteen separate parcels of real estate, of no income and little value to the plaintiff. which were then subject to Joshua Head's previous attachment, and by improperly devolving the agency on Ludwig, the deputy sheriff, caused the same to be appraised at double their value,. viz. $8391.56, thereby reducing the plaintiff's whole debt to $5013. when the value of the property held in mortgage amounted to nearly double that sum; whereby the plaintiff lost the benefit of nearly one half the value of the mortgages, and an equity of redemption was created at his expense, for the benefit of Joshua Head, for the full amount of his debt.

Fessenden & Orr, for defendant, contended:

1. That the plaintiff's instructions, touching all the subjects of complaint, where they were specific, were explicitly obeyed; and where indefinite or discretionary, were reasonably and faithfully fulfilled by the defendant, who gave due and seasonable notice to the plaintiff of all his proceedings, and of all facts within his knowledge, which were material to the plaintiff's interest.

2. That the attachment and sale of the equity of redemption in the mortgaged estates, did not diminish the plaintiff's security by mortgage; it was his own mature and settled plan and purpose, executed by the defendant, that reduced the sum covered by mortgage to its present amount.

3. That the fact of the purchase of the equity of redemption by the son of the debtor, more than a year after the levy of the plaintiff's execution, was no ground in equity to charge the defendant with having reduced the sum covered by mortgage to a value grossly inadequate; that purchase being the price of affection, and resulting from other motives than actuate ordinary purchasers.

4. That it was the plaintiff's duty. when expressly requested. to have given the defendant specific instructions respecting levying on the estates attached. And if any loss accrued, it was through his neglect to give such instructions.

5. That the defendant's instructions to the officer not to reduce, by levy on the lands. the mortgages below the sum of five or six thousand dollars. were just and reasonable. and the best that could have been given for the plaintiff's interest, with all the knowledge or means of knowledge of their value, possessed by the defendant.

6. That the fund secured by mortgage and attachment was rendered as productive by the defendant's agency. as it could have been by any course of proceeding. subject to Joshua Head's prior attachment, if his demand had been first satisfied out of the lands attached.

7. That had any part of the estates attached been omitted to be taken in execution. it would have diminished the plaintiff's fund, and rendered it less valuable than it was.

STORY, Circuit Justice, after referring to the bill, answer. and state of the controversy, proceeded as follows:

This is a case of a very unusual nature, at least in this circuit. The charge in the bill is of fraudulent misconduct on the part of an attorney and counsellor at law, in the management of a suit confided to his care by the plaintiff against one James W. Head, his debtor. and in the levy of the execution. which issued upon the judgment in that suit in his favour for a large amount, whereby the real estate of the debtor has been set off to the plaintiff at a gross overvaluation, and his interests unfairly sacrificed. The charge is of a very grave and important nature; and is doubtless to be listened to by the court with all that watchfulness and attention, which become those, who are called upon to secure an upright administration of public justice. Nor ought it for a moment to be doubted, that as it is the solemn duty of the court to supervise the conduct of its officers, and to discountenance every malpractice and abuse. that duty, however painful, will be performed with all due fidelity to the public. The conduct of attornies. when brought before the court for inquiry and consideration, ought to be scrutinized with the same exactness and rigid impartiality, as if the question were between mere strangers to the bar. And indeed there may naturally be supposed to exist some solicitude, that every act should be more scrupulously weighed, lest the slightest suspicion should arise, that any person might successfully shelter himself from responsibility for injuries behind the protections of his office. On the other hand, the same indulgence must be allowed here, as in all other cases, to inadvertence, mistake, and honest, though misguided, exercise of discretion.

The bill proceeds mainly upon the charge of fraud; and, if that is not made out in the evidence, it must fall; for it is that alone which comes within the cognizance of this court, sitting as a court of equity. There is. indeed. an allegation in the amended bill, of unskilfulness and negligence in the management of the suit by the defendant in certain particulars. But if this allegation is to be taken. as contradistinguished from fraud, it is not a fit subject of inquiry here. A suit at law will lie for such unskilfulness and negligence. and the remedy is plain, complete. and adequate; for there is no pretence to say, that any discovery is wanted to establish these facts. It is to establish the fraud. that a discovery is now sought: and the particulars alluded to are examinable here only so far as they contain indications of fraud. In that view they will require comment.

Taking. then, the case to be one of asserted fraud. I have diligently examined and compared the whole evidence. and the result of my judgment is. that the case is not made out. I acquit the defendant of any meditated or intentional misconduct. I do not say, that

there are not circumstances upon which one might pause; or, if they stood alone and unexplained, which might draw after them heavy suspicions; but they appear to me overcome by the general current of the evidence, taken in connection with the denials of the answer, in such a manner as to leave no sufficient ground for any imputation of ill faith.

I shall now proceed to state the reasons which have led me to this conclusion, commenting principally upon those points upon which most stress was laid at the argument.

The first point made at the bar is, that the defendant, at the time of his retainer by the plaintiff, fraudulently concealed from the plaintiff the fact, that he was the attorney of one Joshua Head, and that he had previously made an attachment in his favour upon the real estate of the debtor, then under mortgage to the plaintiff; whereby the plaintiff was led injuriously to place his confidence in the defendant, and to submit his interests, in the suit about to be commenced, to the management of the defendant.

The facts are, that on the 8th of March, 1820, James W. Head was indebted to the plaintiff in the several sums of $7000, $3000, $1000, and $3338.76, for which the plaintiff held four notes of the debtor. At this time the plaintiff held a mortgage given him in September, 1813, as security for the note of $7000, on the debtor's house and 21 acres of land in the town of Warren, and a landing on George's river; another mortgage given him in June, 1819, as security for the notes of $3000 and $1000, on a farm of 160 acres in the town of Union, and a tract of land in Warren, called the Limekiln and Landing. Feeling insecure, he applied to the defendant to procure additional security for him, and, in the meantime, to make a secret attachment upon the real estate of the debtor. On the 9th of March, the defendant, accordingly, made an attachment on the real estate of the debtor, and, within a few days afterwards, he obtained some additional security, by mortgages for the debts, but failing to obtain what was deemed adequate, he attached the personal property of the debtor, and the suit was prosecuted to judgment at April term, 1820, of the court of common pleas at Wiscasset, and a recovery had for $14.431.44, debt and costs. It is admitted, that previous to these transactions, to wit, on the 6th of March, 1820, the defendant, as attorney of Joshua Head, had made an attachment of the real estate of the debtor, and among others, of the equity of redemption of the real estates in Warren and Union, which were mortgaged to the plaintiff; that judgment was obtained in this suit at the April term, 1821, of the same court for $2060.07, debt and costs, upon which execution duly issued, and the same equity was sold to one James Head (the son of the debtor,) for $2101, to satisfy the execution. It is also admitted, that the existence of this suit was not made known

to the plaintiff at the time of his retainer, nor does it appear to have been made known to the plaintiff throughout its whole progress, though it was pending during the whole year after the plaintiff recovered his judgment, however material it might have been to guide the plaintiff in his own levy on the real estate of the debtor. The plaintiff's execution was, in May, 1820, satisfied in part by a levy on sundry small parcels of land of the debtor, set off by appraisement at the sum of $8785.27, and by an additional levy on his personal estate to the amount of $1145.58, leaving an unsatisfied balance of about $4500 due to the plaintiff. The argument is that to the extent of the levy under James Head's execution on the equity of redemption, this concealment has operated injuriously, and that it was a breach of good faith.

I agree to the doctrine urged at the bar, as to the delicacy of the relation of client and attorney, and the duty of a full, frank, and free disclosure by the latter of every circumstance, which may be presumed to be material, not merely to the interests, but to the fair exercise of the judgment, of the client. An attorney is bound to disclose to his client every adverse retainer, and even every prior retainer, which may affect the discretion of the latter. No man can be supposed to be indifferent to the knowledge of facts, which work directly on his interests, or bear on the freedom of his choice of counsel. When a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity. In this very case, it is by no means clear, that if the prior retainer had been known to the plaintiff, he would have entrusted the defendant with the collection of so large a debt, under circumstances calling for the exercise of so much caution and zeal in the execution of his duty. And it is very certain, that the equity of redemption of the mortgaged estates in Warren and Union (which the plaintiff now esteems the most valuable), might have been placed beyond the reach of Joshua Head's execution by the simple arrangement of continuing the suit, and ultimately leaving the plaintiff's judgment unsatisfied for the sum of $7000, instead of $5000. The plaintiff might have elected this course, if all the facts had been laid before him; and, at all events, the right of election ought to have been submitted to his free and independent judgment. It is matter of regret, that no communication to this effect was made to the plaintiff, since it is obvious, that if it had been made, the whole of this heavy charge against the defendant's honour would have been avoided.

The pressure of this concealment has been made to bear with more severity upon the defendant, by the circumstance of the origin

of the debt, and of the defendant's peculiar relation to the parties. The debt of Joshua Head had its origin in a note payable to him, as guardian of the children of a Mr. Smouse, whose widow the defendant married, and who is, not unnaturally, supposed to take a lively concern in the welfare of these children. The argument is, that this connexion must have operated as a strong motive for the concealment, and that it casts a shade of mala fides over the whole transaction. It appears to me, however, that this circumstance has not as much weight as has been attributed to it at the bar. Joshua Head and his surety on his probate bond of guardianship were at the time, and still continue solvent; and as the attachment was already made out at the time of the plaintiff's retainer, the danger of loss to the children was past, and no stronger motive could operate upon the defendant, if he knew of the attachment, than might operate in case of an attachment by any other client. The most, that could be said, is, that the levy on the equity of redemption might have been prevented; but as the attachment covered many other parcels of estate, it might well have been satisfied out of the latter. Still, I cannot but agree, that the delicacy of the defendant's relation to the parties furnished a new motive for the disclosure; for, however well the plaintiff might have known, that the defendant was the general retained counsel of Joshua Head, his ignorance of this particular debt and attachment repels any notion, that he acted with the knowledge of every important fact.

It is said, however, that, in point of fact, the defendant did not, on the 8th of March know, what attachment had been made on Head's writ, the latter having personally conducted that business with the sheriff. But if the defendant did not know, he might well presume, that an attachment had been made; and it was clearly his duty to have put the plaintiff in possession of all the facts within his knowledge, and thus put him upon inquiry for more definite information. At all events, at the return term of the writ he did know the nature and extent of the attachment, and the knowledge at that time would have been quite as material and important to the plaintiff, as at any antecedent period. Yet an entire silence was preserved, a silence, which it must be admitted, if the other circumstances justified strong suspicions of ill faith, would not be without some significance.

Then, again, it has been said, that the plaintiff afterwards ratified all the proceedings of the defendant, and expressed his satisfaction in the most unequivocal manner. If this were with a full knowledge of all the transactions, the ratification would have a most important bearing. But a ratification, made in ignorance of material facts, cannot give validity to the acts of an attorney in the conduct of a suit, or repel the imputation of fraud. To give any effect, therefore, to

any expressions of this nature, the previous foundation must be laid, that there has been a full disclosure of facts on the part of the attorney, and that the ratification is the result of a judgment acting upon knowledge, and not upon a blind personal confidence in the general integrity of the agent. The evidence on this point is not so direct and satisfactory, as might be wished. But taking the testimony of Ludwig, the deputy sheriff, in July, 1821, in connexion with that of Demuth, as to a conversation with the plaintiff in the June preceding, there is much reason to believe, that the plaintiff's declarations of satisfaction with the defendant's conduct in July, 1821, was with a knowledge of all the material facts.

But, independently of any such ratification, evidencing a consciousness on the part of the plaintiff, that the defendant acted with entire good faith, and for the substantial interest of his client, there are other circumstances in the case, which go very far to establish, that the concealment of Head's attachment, however imprudent or incorrect in a legal view, was not the result of meditated fraud, or an intentional abandonment of official duty. Indeed, such a concealment cannot, per se, be deemed evidence of fraud; but it must derive its force and bearing from the other accompaniments of the transaction. If no interest of the client has been betrayed or injured; if no real loss has been sustained; if there has been displayed throughout a proper zeal and devotion in all other respects to the client's suit, and no motive can be discerned in the concealment, but a misapprehension of duty, the act itself ought not to draw, and cannot draw after it, any imputation of fraud. Men do not perpetrate frauds without some important motive, or sacrifice their professional honour, not only without, but against an apparent interest. The defendant, too, has established some facts in excuse of his silence, which cannot but mitigate in some degree any severity of judgment. He has shown, that the debtor promised him from time to time to pay the debt to Head, and thus to relieve the attachment, and that he gave his own implicit confidence to these assurances. And it is proved beyond controversy, that Head originally required secrecy, as to the existence of his suit, and that the defendant's subsequent conduct was wholly without any concert with Head, or with the judgment debtor, or with any other party having an adverse interest. If, in addition to these considerations, it shall turn out upon a full examination of the case, that the levy of the plaintiff's execution was conducted with a strict regard to his interest, and that he has sustained no loss, and that Head has gained no advantage by the course adopted by the defendant (a topic, to which I shall hereafter advert), then the conclusion would seem to be irresistible, that the point of fraud cannot be maintained. At present, then, we may dismiss the question of concealment, as it bears on the bill

only in so far as it corroborates the main ingredients of fraud, arising aliunde.

Another circumstance relied on to establish fraud is the joinder in one writ of all the notes, so that a single judgment was taken upon all, and thereby the debts secured by mortgage were confounded with the other debt, and the plaintiff injured by impairing his mortgage security. The argument is, that it is now impossible to separate the different items composing the judgment; that the part satisfaction must be applied to the diminution of the mortgage debts, as well as the other; and that thus the mortgage debts will abate pro tanto, and leave much less than the balance due on the judgment covered by that security. And even if this were not the necessary result, still, that it is difficult, if not impracticable, to apply subsequent payments exclusively to the discharge of the unsecured debt. So far as this charge imports unskilfulness in the management of the suit, it has already been answered. Whatever may be the remedy at law, there is none for it in equity. Unskilfulness is not fraud, and may be, and often is, connected with the most scrupulous honesty.

That some inconvenience may arise from the consolidation of all the debts of the plaintiff in a single writ cannot be disguised. It has been suggested at the bar, that it was occasioned by a desire to save costs to the plaintiff, the statute of Maine (St. 1821, p. 260, c. 59) having provided, that "where a plaintiff shall at the same court bring divers actions upon demands, which might have been joined in one, he shall recover no more costs than in one action only." There is much probability in this suggestion; but that in a case, like the present, it ought to have overcome the other important considerations for keeping the secured and unsecured debts distinct from each other is in point of sound discretion more questionable. It however repels in a great measure the imputation of fraud; and, indeed, it is very difficult to perceive, how the joinder of the debts could have aided any contrivance of fraud to benefit Head's attachment, or to defeat the plaintiff's rights, unless the conduct of the levy of the plaintiff's execution was itself collusive. I cannot consider the mere joinder of the debts as gross negligence, presumptive of fraud, or as justly influencing any suspicion derivable from other sources.

Nor am I prepared to admit, that the consequences, assumed at the argument, would legally flow from the joinder of the debts. The mortgage debts were in no just sense extinguished by the judgment; and whenever the mortgages should be enforced in a suit for a foreclosure, upon the hearing in equity to ascertain the amount due every consideration, as to the application of payments and partial satisfaction, would arise, which could be entertained in the ordinary course of a bill in equity. The law is not disputed, that in voluntary payments the debtor may direct the application of them; if he omits it, the creditor may make the application; if neither makes it, the court will marshal the payments according to its own sense of the intention of the parties, and a just administration of equities between them.[2] But the present is not the case of a voluntary payment; but of a satisfaction pro tanto in invitum; and the plaintiff may well be presumed in such a case to make the application in the manner most beneficial to himself. I have no doubt, that it is the duty of a court of equity in such a case to apply the satisfaction primarily to such parts of the judgment, as were not secured by mortgage, leaving the whole balance to rest on the latter.

After all, the case must mainly rest upon the general fairness of the defendant in conducting the suit and the levy of the execution on the judgment in favour of the plaintiff. The charges are, that the execution was improperly levied on fifteen different parcels of real estate of no income or little value, which were then subject to Joshua Head's attachment; that the agency of the levy was improperly confided to Ludwig, the deputy sheriff, instead of the defendant's giving his own personal coöperation and presence; that the appraisement was a gross overvaluation, nearly one half beyond the real value of the property; that the plaintiff's debt was reduced to about $5000, when the value of the mortgaged property was nearly double; and that thus the plaintiff lost the benefit of nearly one half of his mortgages, and an equity of redemption was fraudulently created, at his expense, for the benefit of Joshua Head to the full amount of his debt.

These charges require a separate examination. In the first place, as to the charge of improper agency devolved on the deputy sheriff, who conducted the levy. I am not aware of any authority, which has established, that an attorney is bound to give his personal presence at the time of the levy of an execution of his client on real estate. Our laws authorise real estate to be set off in satisfaction of executions at an appraisement to be made by three disinterested freeholders, one chosen by the creditor, one by the debtor, and one by the officer, who executes the process. If the debtor fails to choose, the officer selects for him also. The appraisers are under oath for the faithful performance of their duty; and the property being once pointed out, or known, there would seem to remain nothing more than the discharge of a ministerial duty. The officer is bound to superintend the whole transaction; the appraisers are presumed to be intelligent and impartial; and it would, therefore, seem to be a case, where the law would not presume the presence of any attorney for

[2] See Heyward v. Lomax, 1 Vern. 24, and Raithby's note 1; Wilkinson v. Sterne, 9 Mod. 427; Perris v. Roberts, 1 Vern. 34; 2 Pow. Mortg. 1120, 1121; Clayton's Case, 1 Mer. 604; Manning v. Westerne, 2 Vern. 606; see Poth. Oblig. pt. 3, art. 7, c. 1; Id. arts. 528–530 et seq.

either party desirable, much less indispensable. I should be sorry to see a different doctrine established. At all events, I will not be the first judge to establish it. There is no pretence, that the officer was not intelligent and faithful, competent to his duty, and zealous for the interest of the plaintiff. Nor is it denied, and if it were, the proofs are clear, that the officer possesses the public confidence, and is worthy of it.

In the next place, as to the value of the parcels of real estate set off on the execution. No imputation has been cast upon the appraisers either in the proofs, or at the argument. On the contrary, it is admitted, that their conduct was pure; and their intelligence and capacity and respectability have not been brought into question. Under such circumstances, it is somewhat difficult to impeach the bona fides of their valuation, or to presume a very gross failure in judgment. How can a presumption of fraudulent overvaluation arise against the defendant, when three discreet and impartial men, under their oaths, sanction the appraisement? From the nature of the case, the actual value of real estate must be a matter of opinion, upon which men of equal skill and honesty may differ in their estimates. To establish such differences is not to impeach their judgment, much less to lay a positive foundation for intentional error. Taking the whole testimony together, I am by no means satisfied, that the weight of it does not substantially support the valuation of the appraisers. At all events, the differences are not more than may be fairly imputed to the ordinary operations of different minds on matters of this nature. Some allowance should also be made for the general habit of estimating real estate on levies by appraisements of its full value, and most favorably to the debtor. If, then, there has been any error, it is attributable, not to the misconduct of the defendant, but to the misguided judgment of the appraisers. It may be the misfortune of the client, but it results from the infirmity of the system of appraisement, and not from the fault of the attorney. My opinion, however, is, that the evidence does not furnish any sufficient ground for just imputation upon any party.

Then, as to the value of the mortgaged property, upon which mainly rests the charge of misconduct in the levy. If that property has not been greatly undervalued by the defendant, but the balance of $5,000 now due on the execution covers its fair value, then the most pressing allegation of fraud made by the bill is effectually removed. It is certain, that the defendant gave directions to the officer not to reduce the execution below $5.000, upon the avowed opinion, that this sum was the full worth of the mortgaged property. A strong circumstance, relied on to establish a higher value of this property, is the fact, that the equity of redemption was sold under Joshua Head's execution for $2,101 to the son

of the debtor. This is certainly prima facie evidence of the purchaser's opinion; and, as the sale was at public auction, it is not unreasonable to presume, that it was a fair bidding. It has been said, that as Joshua Head's debt was deemed by the debtor himself a privileged debt, which he meant at all events to discharge, this purchase ought to be considered as the mere price of affection, and an offering of filial kindness, unaffected by any real consideration of value. The purchase may have turned upon such a consideration; but the court cannot assume the fact, and there is no sufficient evidence to support it. The fact, therefore, would have a strong bearing as proof of actual value, if it stood alone; but would not be decisive of fraud, for an honest opinion might be entertained, that the property was greatly overvalued. There is a great deal of testimony in the case on both sides, as to the value of the mortgaged property. The result of the testimony of the witnesses for the plaintiff gives the average value of about $7,500, conforming very nearly to the price for which the equity sold. That of the witnesses for the defendant (who are more than double in number, and equally respectable) gives a little over $4,000. After weighing the whole circumstances, the conclusion, to which my mind has arrived is, that there is a decided preponderance of opinion, that the value did not much, if at all, exceed $5,000. The property in Warren was open to very opposite calculations from the hopes or fears, which the parties might indulge, as to the future. The village had been flourishing; it was now on the decline. The chance of its revival would naturally give rise to opposite conjectures; and these again would materially influence every opinion as to the value of real estate. The factory in Union had an additional element of uncertainty, for manufacturing establishments had experienced, within a few years, great vicissitudes of alternate prosperity and depression. But what is most material is, that $5.000 is the very estimate (if the testimony is to be believed) which the plaintiff himself put upon the mortgaged property with a full knowledge of its situation. That testimony stands confirmed by his conduct upon various occasions; by the additional security of $8.000 required by him at the time of his attachment; and by his subsequent offer to sacrifice $5,000 of his debt, if the debtor or his friends would secure an absolute payment of the residue. This conduct could not but produce some impression upon the mind of his attorney; and it is surely no proof of fraud, that his estimate, however low, is supported by that of very numerous respectable witnesses, and has commended itself to the plaintiff's own judgment. Nor should it be forgotten, in this view of the case, that if Joshua Head's execution had not been satisfied by the sale of the equity of redemption, it might have been satisfied by a levy on the other real estate, of which the

plaintiff has now had the entire benefit. It is not true, therefore, that the equity of redemption has been created or sold at the plaintiff's expense. And yet the whole fabric of fraud, which the bill so studiously constructs, rests on this as its principal foundation.

There are other circumstances in the case, which have been relied upon by the parties, either to fix or to repel fraud; but I forbear to comment on them. The merits of the case stand on those which have been already discussed; and if those fail, there is an end of the controversy.

I feel entire confidence, that it is my duty to dismiss the bill, and I shall pronounce and decree accordingly. Bill dismissed.