BAR ASSOCIATION OF GREATER CLEVELAND *v.* SHILLMAN.

[Cite as Bar Assn. of Greater Cleveland v. Shillman (1980), 61 Ohio St. 2d 364.]

(D.D. No. 79-19—Decided March 26, 1980.)

*Messrs. Snyder, Neff & Chamberlain, Mr. Owen C. Neff, Messrs. Wallach & Cohn, Mr. Armand I. Cohn, Messrs. Jones, Day, Reavis & Pogue* and *Mr. Robert B. Nelson,* for relator.

*Meyers, Stevens & Rea Co., L.P.A., Mr. Richard C. Talbert, Mr. Richard F. Stevens, Messrs. Hollingsworth & Hollingsworth* and *Mr. Jay A. Hollingsworth,* for respondent.

I.

*Per Curiam.* This cause arises from the findings and recommendation filed with this court on October 23, 1979, by the Board of Commissioners on Grievances and Discipline, wherein the board upon review of the complaint and evidence submitted by relator, the Bar Association of Greater Cleveland, against respondent, David B. Shillman, found that respondent had violated DR 1-102(A)(6), DR 5-105(B) and DR 6-101(A)(1) and (3) of the Code of Professional Responsibility and recommended that respondent be indefinitely suspended from the practice of law.

The facts as adduced from the evidence submitted in the hearings held before the board on January 11 and 12, April 5, and June 21, 1979, demonstrate that respondent was admitted to the Ohio bar in 1961 and became associated in 1966 with a more experienced attorney. Both men thereafter became involved in the preparation of the will of Leon B. Mead, and were named co-executors of his estate. On August 29, 1972, Mr. Mead passed away and his will was subsequently admitted for probate. After making certain bequests, the will divided the residuary property into a marital trust for the benefit of Mrs. Mead, who was approximately 65 years of age at the

time, and a residual trust which designated three charities as beneficiaries. An inventory and appraisal of the estate was filed with the Probate Court on November 28, 1972, which showed that the gross estate consisted mainly of stocks and bonds, and was valued at $836,720.70. Upon the death in April 1973 of respondent's co-executor under the will, respondent became sole executor, trustee and legal counsel for the Mead estate, and was authorized by the will to dispose of the assets of the trust without court approval and without regard to the restrictions imposed on fiduciaries by statute.

The record demonstrates that concurrently with respondent's representation of the Mead estate and trust, he also acted as counsel for "Chagrin Falls Imports, Inc." (CFI), and for its only stockholders, Franz and Johanna Jandl. CFI was in the business of servicing and selling foreign automobiles. The record shows that respondent assisted CFI in securing a loan from a banking institution and, in 1972, incorporated CFI for the Jandls.

Relator's complaint charged, *inter alia,* that respondent's conduct in the representation of the aforementioned parties violated DR 5-105(B) of the Code of Professional Responsibility, which, in pertinent part, provides:

"A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C)."

DR 5-105(C) states:

"In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Relator's charges are predicated in part upon evidence which demonstrates that respondent, from March of 1973 to July of 1976, caused the Mead estate to make a series of 11 loans, totalling $568,750, to both CFI and the Jandls personally. Relator's evidence concerning the repayment of these loans to the Mead estate and trust demonstrates that respondent

permitted CFI to defer payments of principal and interest when the Jandls were financially unable or unwilling to comply with the original loan agreements. Respondent testified that he would permit the Jandls to postpone or renegotiate the loans, if their repayment was not required for the trust to meet its financial obligations. During 1976, for example, the evidence is uncontroverted that out of 23 payments of principal and interest remitted by CFI for outstanding loans to the Mead estate or trust, 13 were made by the execution of promissory notes, and only 10 were actually paid in cash.

Relator contends that respondent's excessive loans to one business and his failure to procure adequate security jeopardized the financial security of the Mead estate and trust. Relator's evidence demonstrates that of the five loans to CFI (totalling $153,750), respondent did not file a security statement for any of them, other than an initial one for $100,000. That financial statement was subordinate, however, to a preexisting financing statement securing a loan to CFI by a bank. The evidence with respect to five loans to the Jandls totalling $215,000 demonstrates that respondent secured these loans with a second mortgage on the property purchased with the loan proceeds, which property was appraised at $211,000. The first mortgage amounted to $80,000 and was held by another creditor. The sixth loan to the Jandls, amounting to $200,000, was disbursed to purchase additional property for CFI, which was appraised at $285,000, and was secured by a first mortgage on the purchased property. It appears from the personal income tax returns of the Jandls that their ability to repay these loans was coupled directly to the profitability of CFI, their apparent major source of income.

During the period when respondent was executing the aforementioned series of loans to CFI, relator's evidence establishes that respondent was also obtaining extraordinary concessions from CFI as one of its retail customers. In 1972, respondent purchased from CFI a new Mercedes Benz which was later damaged in an accident. Respondent engaged CFI to make the necessary repairs and subsequently rented substitute transportation from them. No payments were apparently made by respondent for these services during 1973, and relator's evidence shows that respondent remitted no

payments on his open account with CFI during 1974, which at year's end amounted to $18,373.55. No payments were reflected on CFI accounts for respondent during 1975. However, in 1976, respondent's account was credited with $10,450 in payment to the Jandls. Respondent delivered, in 1977, a promissory note payable to Johanna Jandl for the unpaid balance of his account, which at that time stood at $6,173.55. Respondent testified that, at the time of the proceedings before the board, this note had been paid in full as a result of respondent's representation of the Jandls in a matter involving one of their properties.

The evidence in the record with reference to the communications between respondent and Mrs. Mead, the primary beneficiary of the estate and trust, demonstrates that respondent apparently received Mrs. Mead's written consent prior to the execution of the initial $100,000 loan to CFI in 1973. Respondent testified with regard to subsequent loans that Mrs. Mead was periodically informed verbally as to the total amount of loans outstanding to CFI and the Jandls.

Upon a review of relator's evidence with reference to DR 5-105(B), this court concurs in the finding and recommendation of the board that respondent's conduct with respect to his multiple representation of the Mead estate and trust and CFI violated DR 5-105(B) of the Code of Professional Responsibility. When the respondent initially secured loans for CFI and the Jandls from the assets of the estate and trust, and thereafter continued to represent and advise those parties, it should have become apparent that a conflict of interest had arisen from which it was probable that respondent's independent professional judgment would be, or was likely to be, adversely affected. Under Canon 5 of the Code of Professional Responsibility, every client is entitled to the undivided fidelity of his attorney if he so elects. Therefore, it was incumbent upon respondent to advise those clients possessing competing interests of any potentially adverse effects which might cause respondent to support for one client what his professional duty for the other required him to oppose. As Justice Story stated long ago in *Williams* v. *Reed,* 3 Mason 405 (C.C. Maine 1824), at page 418:

"An attorney is bound to disclose to his client every ad-

verse retainer, and even every prior retainer, which may affect the discretion of the latter. No man can be supposed to be indifferent to the knowledge of facts, which work directly on his interests, or bear on the freedom of his choice of counsel. When a client employs an attorney, he has the right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity." See *In Re Kamp* (1963), 40 N.J. 588, 194 A. 2d 236.

The record in this cause is barren of evidence which demonstrates that respondent complied with his ethical obligation to fully advise Mrs. Mead and the other beneficiaries of the trust of his concurrent representation of CFI and the Jandls, or of the potentially adverse effect that this arrangement could have on his independent professional judgment in the representation of the Mead estate and trust.

Furthermore, our review of the record demonstrates that during his concurrent representation of the persons and entities herein, respondent failed to adequately represent the interests of the Mead estate or trust. Canon 5 of the Code of Professional Responsibility made it incumbent upon respondent, when he entered the multiple representation, to determine whether he would be able to adequately represent all interests; to the extent that he would not be able to do so, it was respondent's duty to disassociate himself from the multiple representation. The record shows, however, that respondent continued to represent the interests herein during a time when such interests came into conflict, and that respondent eventually allowed the concerns of the Jandls and CFI to transcend those of the estate and the trust. Respondent's actions in this regard are exemplified by the evidence which shows that respondent, without adequate security, channeled over two-thirds of the assets of the Mead estate and trust into a business venture whose viability and profitability was at that time unproven. At the same time respondent was providing this business with its venture capital, he was accepting extraordinary privileges from its owners, in apparent exchange for his deference in the representation of the interests of the investing client. Such actions on respondent's part are untenable and constitute a clear violation of DR 5-105(B).

## II.

Relator charges further that respondent's conduct in this matter violated DR 6-101(A)(1) and (3) of the Code of Professional Responsibility. DR 6-101 provides, in pertinent part:

"(A) A lawyer shall not:

"(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

"* * *

"(3) Neglect a legal matter entrusted to him."

At the outset, we note that respondent initially undertook the administration of this sizable estate with the assistance of a co-executor who had prior experience in the administration of decedents' estates. However, when respondent's co-counsel passed away in April of 1973, respondent alone assumed the responsibilities of executor, trustee and legal counsel for both the estate and the trust until his removal from those positions in October of 1976. Respondent's own testimony indicates that prior to his involvement with this estate, he had never before administered an estate of this complexity.

With respect to respondent's obligation as executor to file periodic accountings with the Probate Court during the administration of the estate, the record indicates that respondent filed on December 26, 1973, a "First Partial Account," but only after the Probate Court had issued a citation and binding attachment against respondent for contempt to compel said filing. On June 6, 1975, a second document, a second partial account, was filed by respondent, but again only after it was overdue and the Probate Court had issued a citation. Additionally, the court commenced, *sua sponte,* proceedings to remove respondent as executor of the estate. The last and "Final Account" was filed by respondent on February 14, 1977, a number of months after it was due and after the Probate Court had again issued a citation and a motion to remove respondent from the administration of the estate.

With reference to respondent's administration of the trust, the evidence indicates that the "First and Final" account was filed by respondent on February 14, 1977, following the Probate Court's issuance of a notice of delinquency, a citation and a motion to remove respondent as trustee.

In addition to the aforementioned problems associated with the filing of accounts in the Probate Court, the record indicates that a substantial number of material errors and omissions occurred regarding respondent's preparation of tax documents for both the estate and the trust. In 1976, representatives from the Internal Revenue Service (IRS) appeared at respondent's office and advised him that an investigation was underway relative to the failure of the Mead estate to file a federal estate tax return for 1972. Although respondent produced a carbon copy of the return from his deceased co-executor's files, the testimony of respondent's successor to the administration of the Mead estate indicates that IRS has consistently taken the position that, because no return was in fact received for that year, the estate must pay the amount of the alleged tax due, plus accrued penalties and interest charges from 1972.

The record demonstrates further that respondent failed to prepare and file federal fiduciary income tax returns for either the estate or the trust. Respondent testified that it was his judgment at the time that these returns were not required under his interpretation of certain written instructions from IRS. It was admitted by respondent in retrospect, however, that his interpretation was "totally erroneous." Furthermore, respondent testified that he did not prepare or file personal property tax returns for either the estate or the trust, nor did he submit an Ohio Estate Tax Return in a timely fashion. The tardy filing of the state return caused an assessment against the estate of approximately an additional $800, which respondent paid with a check out of the funds of the estate. This disbursement of funds for payment of the penalty was subsequently recognized by respondent to be improper in that respondent was personally liable for the imposition of that assessment. Additional interest charges attributable to this late filing have subsequently been incurred and paid by the successor counsel.*

Our review of relator's evidence with regard to the manner in which respondent executed his professional duties in the

---

* Although the precise amount of the interest charges attributable to the late tax payments has not been finally determined, counsel for the estate indicates that some interest will be chargeable to the estate from these transactions.

administration of this estate and trust fully supports the board's finding that respondent violated DR 6-101(A)(1) and (3) of the Code of Professional Responsibility.

Relator has charged that respondent's conduct also violated DR 1-102(A)(6), which provides that a lawyer shall not "engage in any other conduct that adversely reflects upon his fitness to practice law." We conclude upon a review of the record that the totality of respondent's professional conduct in this cause constitutes a violation of DR 1-102(A)(6).

In view of all the foregoing, respondent is indefinitely suspended from the practice of law.

*Judgment accordingly.*

CELEBREZZE, C. J., HERBERT, W. BROWN, P. BROWN, SWEENEY, LOCHER and HOLMES, JJ., concur.