CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL
NO. 391 *v.* TERRY ET AL.

No. 88–1719.   Argued December 6, 1989—Decided March 20, 1990

MARSHALL, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–B, and IV, in which REHNQUIST, C. J., and BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined, and an opinion with respect to Part III–A, in which REHNQUIST, C. J., and WHITE and BLACKMUN, JJ., joined. BRENNAN, J., post, p. 574, and STEVENS, J., post, p. 581, filed opinions concurring in part and concurring in the judgment. KENNEDY, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined, post, p. 584.

*J. David James* argued the cause for petitioner. With him on the briefs were *Walter Kamiat* and *Laurence Gold.*

*Robert M. Elliot* argued the cause for respondents. With him on the brief was *David C. Pishko.*\*

*\*I. Michael Greenberger, Richard M. Wyner,* and *David P. Lee* filed a brief for the National Railway Labor Conference as *amicus curiae* urging reversal.

*Paul Alan Levy, Alan B. Morrison,* and *Arthur L. Fox II* filed a brief for Teamsters for a Democratic Union as *amicus curiae* urging affirmance.

*Peter G. Nash, Dixie L. Atwater,* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States of America as *amicus curiae.*

JUSTICE MARSHALL delivered the opinion of the Court, except as to Part III–A.

This case presents the question whether an employee who seeks relief in the form of backpay for a union's alleged breach of its duty of fair representation has a right to trial by jury. We hold that the Seventh Amendment entitles such a plaintiff to a jury trial.

I

McLean Trucking Company and the Chauffeurs, Teamsters and Helpers Local No. 391 (Union) were parties to a collective-bargaining agreement that governed the terms and conditions of employment at McLean's terminals. The 27 respondents were employed by McLean as truckdrivers in bargaining units covered by the agreement, and all were members of the Union. In 1982 McLean implemented a change in operations that resulted in the elimination of some of its terminals and the reorganization of others. As part of that change, McLean transferred respondents to the terminal located in Winston-Salem and agreed to give them special seniority rights in relation to "inactive" employees in Winston-Salem who had been laid off temporarily.

After working in Winston-Salem for approximately six weeks, respondents were alternately laid off and recalled several times. Respondents filed a grievance with the Union, contesting the order of the layoffs and recalls. Respondents also challenged McLean's policy of stripping any driver who was laid off of his special seniority rights. Respondents claimed that McLean breached the collective-bargaining agreement by giving inactive drivers preference over respondents. After these proceedings, the grievance committee ordered McLean to recall any respondent who was then laid off and to lay off any inactive driver who had been recalled; in addition, the committee ordered McLean to recognize respondents' special seniority rights until the inactive employees were properly recalled.

On the basis of this decision, McLean recalled respondents and laid off the drivers who had been on the inactive list when respondents transferred to Winston-Salem. Soon after this, though, McLean recalled the inactive employees, thereby allowing them to regain seniority rights over respondents. In the next round of layoffs, then, respondents had lower priority than inactive drivers and were laid off first. Accordingly, respondents filed another grievance, alleging that McLean's actions were designed to circumvent the initial decision of the grievance committee. The Union representative appeared before the grievance committee and presented the contentions of respondents and those of the inactive truckdrivers. At the conclusion of the hearing, the committee held that McLean had not violated the committee's first decision.

McLean continued to engage in periodic layoffs and recalls of the workers at the Winston-Salem terminal. Respondents filed a third grievance with the Union, but the Union declined to refer the charges to a grievance committee on the ground that the relevant issues had been determined in the prior proceedings.

In July 1983, respondents filed an action in District Court, alleging that McLean had breached the collective-bargaining agreement in violation of § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185 (1982 ed.),[1] and that the Union had violated its duty of fair representation. Respondents requested a permanent injunction requiring the defendants to cease their illegal acts and to rein-

---

[1] Section 301(a) of the Labor Management Relations Act, 1947, provides for suits by and against labor unions:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 61 Stat. 156, 29 U. S. C. § 185(a) (1982 ed.).

state them to their proper seniority status; in addition, they sought, *inter alia*, compensatory damages for lost wages and health benefits. In 1986 McLean filed for bankruptcy; subsequently, the action against it was voluntarily dismissed, along with all claims for injunctive relief.

Respondents had requested a jury trial in their pleadings. The Union moved to strike the jury demand on the ground that no right to a jury trial exists in a duty of fair representation suit. The District Court denied the motion to strike. After an interlocutory appeal, the Fourth Circuit affirmed the trial court, holding that the Seventh Amendment entitled respondents to a jury trial of their claim for monetary relief. 863 F. 2d 334 (1988). We granted the petition for certiorari to resolve a Circuit conflict on this issue,[2] 491 U. S. 903 (1989), and now affirm the judgment of the Fourth Circuit.

## II

The duty of fair representation is inferred from unions' exclusive authority under the National Labor Relations Act (NLRA), 49 Stat. 449, 29 U. S. C. § 159(a) (1982 ed.), to represent all employees in a bargaining unit. *Vaca* v. *Sipes*, 386 U. S. 171, 177 (1967). The duty requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Ibid.* A union must discharge its duty both in bargaining with the employer and in its enforcement of the resulting collective-bargaining agreement. *Ibid.* Thus, the Union here was required to pursue respondents' grievances in a manner consistent with the principles of fair representation.

---

[2] Compare *Leach* v. *Pan American World Airways*, 842 F. 2d 285 (CA11 1988) (no right to a jury trial), with *United Transportation Union, Local 74* v. *Consolidated Rail Corp.*, 881 F. 2d 282 (CA6 1989) (allowing plaintiff the right to a jury trial); *Terry* v. *Chauffeurs, Teamsters and Helpers, Local 391*, 863 F. 2d 334 (CA4 1988) (same); *Quinn* v. *DiGiulian*, 238 U. S. App. D. C. 247, 739 F. 2d 637 (1984) (same); *Roscello* v. *Southwest Airlines Co.*, 726 F. 2d 217 (CA5 1984) (same).

Because most collective-bargaining agreements accord finality to grievance or arbitration procedures established by the collective-bargaining agreement, an employee normally cannot bring a § 301 action against an employer unless he can show that the union breached its duty of fair representation in its handling of his grievance. *DelCostello* v. *Teamsters*, 462 U. S. 151, 163–164 (1983). Whether the employee sues both the labor union and the employer or only one of those entities, he must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation. *Id.*, at 164–165.

## III

We turn now to the constitutional issue presented in this case—whether respondents are entitled to a jury trial.[3] The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The right to a jury trial includes more than the common-law forms of action recognized in 1791; the phrase "Suits at common law" refers to "suits in which *legal* rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered." *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830); see also *ibid.* ("[T]he amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights"). The right extends to

---

[3] Because the NLRA, 49 Stat. 449, 29 U. S. C. § 159(a) (1982 ed.), does not expressly create the duty of fair representation, resort to the statute to determine whether Congress provided for a jury trial in an action for breach of that duty is unavailing. Cf. *Curtis* v. *Loether*, 415 U. S. 189, 192, n. 6 (1974) (recognizing the "'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided'" (quoting *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 369 (1971))).

causes of action created by Congress. *Tull* v. *United States*, 481 U. S. 412, 417 (1987). Since the merger of the systems of law and equity, see Fed. Rule Civ. Proc. 2, this Court has carefully preserved the right to trial by jury where legal rights are at stake. As the Court noted in *Beacon Theatres, Inc.* v. *Westover*, 359 U. S. 500, 501 (1959), "'Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care'" (quoting *Dimick* v. *Schiedt*, 293 U. S. 474, 486 (1935)).

To determine whether a particular action will resolve legal rights, we examine both the nature of the issues involved and the remedy sought. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull, supra,* at 417–418 (citations omitted). The second inquiry is the more important in our analysis. *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 42 (1989).[4]

## A

An action for breach of a union's duty of fair representation was unknown in 18th-century England; in fact, collective bar-

---

[4] JUSTICE STEVENS' analysis emphasizes a third consideration, namely whether "the issues [presented by the claim] are typical grist for the jury's judgment." *Post,* at 583. This Court, however, has never relied on this consideration "as an independent basis for extending the right to a jury trial under the Seventh Amendment." *Tull* v. *United States*, 481 U. S. 412, 418, n. 4 (1987). We recently noted that this consideration is relevant only to the determination "whether Congress has permissibly entrusted the resolution of certain disputes to an administrative agency or specialized court of equity, and whether jury trials would impair the functioning of the legislative scheme." *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S., at 42, n. 4. No one disputes that an action for breach of the duty of fair representation may properly be brought in an Article III court; thus, the factor does not affect our analysis.

gaining was unlawful. See N. Citrine, Trade Union Law 4–7 (2d ed. 1960). We must therefore look for an analogous cause of action that existed in the 18th century to determine whether the nature of this duty of fair representation suit is legal or equitable.

The Union contends that this duty of fair representation action resembles a suit brought to vacate an arbitration award because respondents seek to set aside the result of the grievance process. In the 18th century, an action to set aside an arbitration award was considered equitable. 2 J. Story, Commentaries on Equity Jurisprudence § 1452, pp. 789–790 (13th ed. 1886) (equity courts had jurisdiction over claims that an award should be set aside on the ground of "mistake of the arbitrators"); see, *e. g.*, *Burchell* v. *Marsh*, 17 How. 344 (1855) (reviewing bill in equity to vacate an arbitration award). In support of its characterization of the duty of fair representation claim, the Union cites *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56 (1981), in which we held that, for purposes of selecting from various state statutes an appropriate limitations period for a § 301 suit against an employer, such a suit was more analogous to a suit to vacate an arbitration award than to a breach of contract action. *Id.*, at 62.[5]

The arbitration analogy is inapposite, however, to the Seventh Amendment question posed in this case. No grievance committee has considered respondents' claim that the Union violated its duty of fair representation; the grievance process was concerned only with the employer's alleged breach of the collective-bargaining agreement. Thus, respondents' claim against the Union cannot be characterized as an action to va-

---

[5] We later abandoned the reliance on state statutes of limitations for § 301 actions, and instead applied the federal limitations period for unfair labor practice charges, § 10(b) of the NLRA, 49 Stat. 453, as amended, 29 U. S. C. § 160(b) (1982 ed.), to both a § 301 claim against an employer and a duty of fair representation claim against a union. *DelCostello* v. *Teamsters*, 462 U. S. 151 (1983).

cate an arbitration award because "'[t]he arbitration proceeding did not, and indeed, could not, resolve the employee's claim against the union. . . . Because no arbitrator has decided the primary issue presented by this claim, no arbitration award need be undone, even if the employee ultimately prevails.'" *DelCostello*, 462 U. S., at 167 (quoting *Mitchell*, *supra*, at 73 (STEVENS, J., concurring in part and dissenting in part) (footnotes omitted)).

The Union next argues that respondents' duty of fair representation action is comparable to an action by a trust beneficiary against a trustee for breach of fiduciary duty. Such actions were within the exclusive jurisdiction of courts of equity. 2 Story, *supra*, § 960, p. 266; Restatement (Second) of Trusts § 199(c) (1959). This analogy is far more persuasive than the arbitration analogy. Just as a trustee must act in the best interests of the beneficiaries, 2A W. Fratcher, Scott on Trusts § 170 (4th ed. 1987), a union, as the exclusive representative of the workers, must exercise its power to act on behalf of the employees in good faith, *Vaca* v. *Sipes*, 386 U. S., at 177. Moreover, just as a beneficiary does not directly control the actions of a trustee, 3 Fratcher, *supra*, § 187, an individual employee lacks direct control over a union's actions taken on his behalf, see Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich. L. Rev. 1, 21 (1958).

The trust analogy extends to a union's handling of grievances. In most cases, a trustee has the exclusive authority to sue third parties who injure the beneficiaries' interest in the trust, 4 Fratcher, *supra*, § 282, pp. 25–29, including any legal claim the trustee holds in trust for the beneficiaries, Restatement (Second) of Trusts, *supra*, § 82, comment *a*. The trustee then has the sole responsibility for determining whether to settle, arbitrate, or otherwise dispose of the claim. Restatement (Second) of Trusts, *supra*, § 192. Similarly, the union typically has broad discretion in its decision whether and how to pursue an employee's grievance against

an employer. See, *e. g., Vaca* v. *Sipes, supra,* at 185. Just as a trust beneficiary can sue to enforce a contract entered into on his behalf by the trustee only if the trustee "improperly refuses or neglects to bring an action against the third person," Restatement (Second) of Trusts, *supra,* § 282(2), so an employee can sue his employer for a breach of the collective-bargaining agreement only if he shows that the union breached its duty of fair representation in its handling of the grievance, *DelCostello, supra,* at 163–164. See *Bowen* v. *United States Postal Service,* 459 U. S. 212, 243 (1983) (WHITE, J., concurring in judgment in part and dissenting in part).

Respondents contend that their duty of fair representation suit is less like a trust action than an attorney malpractice action, which was historically an action at law, see, *e. g., Russell* v. *Palmer,* 2 Wils. K. B. 325, 95 Eng. Rep. 837 (1767). In determining the appropriate statute of limitations for a hybrid § 301/duty of fair representation action, this Court in *DelCostello* noted in dictum that an attorney malpractice action is "the closest state-law analogy for the claim against the union." 462 U. S., at 167. The Court in *DelCostello* did not consider the trust analogy, however. Presented with a more complete range of alternatives, we find that, in the context of the Seventh Amendment inquiry, the attorney malpractice analogy does not capture the relationship between the union and the represented employees as fully as the trust analogy does.

The attorney malpractice analogy is inadequate in several respects. Although an attorney malpractice suit is in some ways similar to a suit alleging a union's breach of its fiduciary duty, the two actions are fundamentally different. The nature of an action is in large part controlled by the nature of the underlying relationship between the parties. Unlike employees represented by a union, a client controls the significant decisions concerning his representation. Moreover, a client can fire his attorney if he is dissatisfied with his attor-

ney's performance. This option is not available to an individual employee who is unhappy with a union's representation, unless a majority of the members of the bargaining unit share his dissatisfaction. See *J. I. Case Co.* v. *NLRB*, 321 U. S. 332, 338–339 (1944). Thus, we find the malpractice analogy less convincing than the trust analogy.

Nevertheless, the trust analogy does not persuade us to characterize respondents' claim as wholly equitable. The Union's argument mischaracterizes the nature of our comparison of the action before us to 18th-century forms of action. As we observed in *Ross* v. *Bernhard*, 396 U. S. 531 (1970), "The Seventh Amendment question depends on the nature of the *issue* to be tried rather than the character of the overall action." *Id.*, at 538 (emphasis added) (finding a right to jury trial in a shareholder's derivative suit, a type of suit traditionally brought in courts of equity, because plaintiffs' case presented legal issues of breach of contract and negligence). As discussed above, see *supra*, at 564, to recover from the Union here, respondents must prove both that McLean violated § 301 by breaching the collective-bargaining agreement and that the Union breached its duty of fair representation.[6] When viewed in isolation, the duty of fair representation issue is analogous to a claim against a trustee for breach of fiduciary duty. The § 301 issue, how-

---

[6] The dissent characterizes this opinion as "pars[ing] legal elements out of equitable claims." *Post*, at 590. The question whether the Seventh Amendment analysis requires an examination of the nature of each element of a typical claim is not presented by this case. The claim we confront here is not typical; instead, it is a claim consisting of discrete issues that would normally be brought as two claims, one against the employer and one against the union. Had the employer remained a defendant in this action, the dissent would surely agree that the § 301 claim against the employer was a separate claim. The Seventh Amendment analysis should not turn on the ability of the plaintiff to maintain his suit against both defendants, when the issues in the suit remain the same even when he can sue only the union. Consideration of the nature of the two issues in this hybrid action is therefore warranted.

ever, is comparable to a breach of contract claim—a legal issue.[7]

Respondents' action against the Union thus encompasses both equitable and legal issues. The first part of our Seventh Amendment inquiry, then, leaves us in equipoise as to whether respondents are entitled to a jury trial.

## B

Our determination under the first part of the Seventh Amendment analysis is only preliminary. *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S., at 47. In this case, the only remedy sought is a request for compensatory damages representing backpay and benefits. Generally, an action for money damages was "the traditional form of relief offered in the courts of law." *Curtis* v. *Loether*, 415 U. S. 189, 196 (1974). This Court has not, however, held that "any award of monetary relief must *necessarily* be 'legal' relief." *Ibid.* (emphasis added). See also *Granfinanciera, supra,* at 86, n. 9 (WHITE, J., dissenting). Nonetheless, because we conclude that the remedy respondents seek has none of the attributes that must be present before we will find an exception to the general rule and characterize damages as equitable, we find that the remedy sought by respondents is legal.

First, we have characterized damages as equitable where they are restitutionary, such as in "action[s] for disgorgement of improper profits," *Tull*, 481 U. S., at 424. See also *Curtis* v. *Loether, supra,* at 197; *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 402 (1946). The backpay sought by re-

---

[7] In *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56 (1981), we found a § 301 action against the employer more analogous to a suit to set aside an arbitration award than to a breach of contract suit because the employee, to overturn the grievance committee's decision, had to prove that the union violated its duty of fair representation. *Id.*, at 62. In that case, we analyzed the action as a whole; in this case, however, the Seventh Amendment requires that we treat each issue separately. When considered by itself, the § 301 issue is closely analogous to a breach of contract claim.

spondents is not money wrongfully held by the Union, but wages and benefits they would have received from McLean had the Union processed the employees' grievances properly. Such relief is not restitutionary.

Second, a monetary award "incidental to or intertwined with injunctive relief" may be equitable. *Tull, supra,* at 424. See, *e. g., Mitchell* v. *Robert DeMario Jewelry, Inc.,* 361 U. S. 288, 291–292 (1960) (District Court had power, incident to its injunctive powers, to award backpay under the Fair Labor Standards Act; also backpay in that case was restitutionary). Because respondents seek only money damages, this characteristic is clearly absent from the case.[8]

The Union argues that the backpay relief sought here must nonetheless be considered equitable because this Court has labeled backpay awarded under Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* (1982 ed.), as equitable. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 415–418 (1975) (characterizing backpay awarded against em-

---

[8] Both the Union and the dissent argue that the backpay award sought here is equitable because it is closely analogous to damages awarded to beneficiaries for a trustee's breach of trust. See *post,* at 587. Such damages were available only in courts of equity because those courts had exclusive jurisdiction over actions involving a trustee's breach of his fiduciary duties. See 3 W. Fratcher, Scott on Trusts § 205, p. 240 (4th ed. 1987); Restatement (Second) of Trusts § 205(a), and comment *c,* illustration 2 (1959).

The Union's argument, however, conflates the two parts of our Seventh Amendment inquiry. Under the dissent's approach, if the action at issue were analogous to an 18th-century action within the exclusive jurisdiction of the courts of equity, we would necessarily conclude that the remedy sought was also equitable because it would have been unavailable in a court of law. This view would, in effect, make the first part of our inquiry dispositive. We have clearly held, however, that the second part of the inquiry—the nature of the relief—is more important to the Seventh Amendment determination. See *supra,* at 565. The second part of the analysis, therefore, should not replicate the "abstruse historical" inquiry of the first part, *Ross* v. *Bernhard,* 396 U. S. 531, 538, n. 10 (1970), but requires consideration of the general types of relief provided by courts of law and equity.

ployer under Title VII as equitable in context of assessing whether judge erred in refusing to award such relief). It contends that the Title VII analogy is compelling in the context of the duty of fair representation because the Title VII backpay provision was based on the NLRA provision governing backpay awards for unfair labor practices, 29 U. S. C. § 160(c) (1982 ed.) ("[W]here an order directs reinstatement of an employee, back pay may be required of the employer or labor organization"). See *Albemarle Paper Co.* v. *Moody*, *supra*, at 419. We are not convinced.

The Court has never held that a plaintiff seeking backpay under Title VII has a right to a jury trial. See *Lorillard* v. *Pons*, 434 U. S. 575, 581–582 (1978). Assuming, without deciding, that such a Title VII plaintiff has no right to a jury trial, the Union's argument does not persuade us that respondents are not entitled to a jury trial here. Congress specifically characterized backpay under Title VII as a form of "equitable relief." 42 U. S. C. § 2000e–5(g) (1982 ed.) ("[T]he court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate"). See also *Curtis* v. *Loether*, *supra*, at 196–197 (distinguishing backpay under Title VII from damages under Title VIII, the fair housing provision of the Civil Right Act, 42 U. S. C. §§ 3601–3619 (1982 ed.), which the Court characterized as "legal" for Seventh Amendment purposes). Congress made no similar pronouncement regarding the duty of fair representation. Furthermore, the Court has noted that backpay sought from an employer under Title VII would generally be restitutionary in nature, see *Curtis* v. *Loether*, *supra*, at 197, in contrast to the damages sought here from the Union. Thus, the remedy sought in this duty of fair representation case is clearly different from backpay sought for violations of Title VII.

Moreover, the fact that Title VII's backpay provision may have been modeled on a provision in the NLRA concerning remedies for unfair labor practices does not require that the backpay remedy available here be considered equitable. The Union apparently reasons that if Title VII is comparable to one labor law remedy it is comparable to all remedies available in the NLRA context. Although both the duty of fair representation and the unfair labor practice provisions of the NLRA are components of national labor policy, their purposes are not identical. Unlike the unfair labor practice provisions of the NLRA, which are concerned primarily with the public interest in effecting federal labor policy, the duty of fair representation targets "'the wrong done the individual employee.'" *Electrical Workers* v. *Foust*, 442 U. S. 42, 49, n. 12 (1979) (quoting *Vaca* v. *Sipes*, 386 U. S., at 182, n. 8) (emphasis deleted). Thus, the remedies appropriate for unfair labor practices may differ from the remedies for a breach of the duty of fair representation, given the need to vindicate different goals. Certainly, the connection between backpay under Title VII and damages under the unfair labor practice provision of the NLRA does not require us to find a parallel connection between Title VII backpay and money damages for breach of the duty of fair representation.

We hold, then, that the remedy of backpay sought in this duty of fair representation action is legal in nature. Considering both parts of the Seventh Amendment inquiry, we find that respondents are entitled to a jury trial on all issues presented in their suit.

## IV

On balance, our analysis of the nature of respondents' duty of fair representation action and the remedy they seek convinces us that this action is a legal one. Although the search for an adequate 18th-century analog revealed that the claim includes both legal and equitable issues, the money damages respondents seek are the type of relief traditionally awarded by courts of law. Thus, the Seventh Amendment entitles re-

spondents to a jury trial, and we therefore affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE BRENNAN, concurring in part and concurring in the judgment.

I agree with the Court that respondents seek a remedy that is legal in nature and that the Seventh Amendment entitles respondents to a jury trial on their duty of fair representation claims. I therefore join Parts I, II, III–B, and IV of the Court's opinion. I do not join that part of the opinion which reprises the particular historical analysis this Court has employed to determine whether a claim is a "Sui[t] at common law" under the Seventh Amendment, *ante,* at 564, because I believe the historical test can and should be simplified.

The current test, first expounded in *Curtis* v. *Loether,* 415 U. S. 189, 194 (1974), requires a court to compare the right at issue to 18th-century English forms of action to determine whether the historically analogous right was vindicated in an action at law or in equity, and to examine whether the remedy sought is legal or equitable in nature. However, this Court, in expounding the test, has repeatedly discounted the significance of the analogous form of action for deciding where the Seventh Amendment applies. I think it is time we dispense with it altogether.[1] I would decide Seventh Amendment questions on the basis of the relief sought. If the relief is legal in nature, *i. e.,* if it is the kind of relief that historically was available from courts of law, I would hold that the parties have a constitutional right to a trial by jury — unless Congress has permissibly delegated the particular dispute to a non-Article III decisionmaker and jury trials would

---

[1] I therefore also do not join Part III–A of JUSTICE MARSHALL's opinion because it considers which 18th-century actions are comparable to the modern-day statutory claim brought here.

frustrate Congress' purposes in enacting a particular statutory scheme.[2]

I believe that our insistence that the jury trial right hinges in part on a comparison of the substantive right at issue to forms of action used in English courts 200 years ago needlessly convolutes our Seventh Amendment jurisprudence. For the past decade and a half, this Court has explained that the two parts of the historical test are not equal in weight, that the nature of the remedy is more important than the nature of the right. See *ante*, at 565; *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 42 (1989); *Tull* v. *United States*, 481 U. S. 412, 421 (1987); *Curtis* v. *Loether, supra*, at 196. Since the existence of a right to jury trial therefore turns on the nature of the remedy, absent congressional delegation to a specialized decisionmaker,[3] there remains little purpose to our rattling through dusty attics of ancient writs. The time has come to borrow William of Occam's razor and sever this portion of our analysis.

---

[2] As the majority notes, *ante*, at 565, n. 4, where Congress has delegated a particular claim to an administrative agency or specialized court of equity, a court must consider whether the delegation is a permissible one and "whether jury trials would impair the functioning of the legislative scheme." *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 42, n. 4 (1989). These questions are not implicated in this case, as it is undisputed that an action for breach of the duty of fair representation may be brought in an Article III court. *Ante*, at 565, n. 4.

[3] Even where Congress has assigned resolution of a dispute to a specialized forum, the right to a jury trial does not turn on whether the analogous 18th-century action was legal or equitable. As we explained in *Granfinanciera, S. A., supra*, at 42 and n. 4, a court first looks to the analogous historical form of action and the nature of the relief sought, alloting greater weight to the nature of the relief. If this inquiry leads the court to conclude that the party is entitled to a jury trial, the court must consider whether the party is asserting a public right or private right—a distinction contingent on the government's role in creating the right, see 492 U. S., at 42, n. 4—and whether jury trials would impair the functioning of the legislative scheme. The result of the search for a historical analog is subordinate to the nature of the relief sought and irrelevant to the subsequent inquiry.

We have long acknowledged that, of the factors relevant to the jury trial right, comparison of the claim to ancient forms of action, "requiring extensive and possibly abstruse historical inquiry, is obviously the most difficult to apply." *Ross* v. *Bernhard*, 396 U. S. 531, 538, n. 10 (1970). Requiring judges, with neither the training nor time necessary for reputable historical scholarship, to root through the tangle of primary and secondary sources to determine which of a hundred or so writs is analogous to the right at issue has embroiled courts in recondite controversies better left to legal historians. For example, in *Granfinanciera, S. A., supra,* decided last Term, both JUSTICE WHITE, in dissent, and I, writing for the Court, struggled with the question whether an equity court would have heard the suit that was comparable to the modern statutory action at issue. I quoted Professor Garrard Glenn. *Id.,* at 44. JUSTICE WHITE countered that "[o]ther scholars have looked at the same history and come to a different conclusion. Still others have questioned the soundness of the distinction that Professor Glenn drew . . . . Trying to read the ambiguous history concerning fraudulent conveyance actions in equity . . . has perplexed jurists in each era, who have come to conflicting decisions each time that the question has found relevance." *Id.,* at 85 (footnote omitted). I countered with an item-by-item evaluation of JUSTICE WHITE's sources. See *id.,* at 47, n. 6.[4]

---

[4]The lower courts have not had an easier time of it. In *Damsky* v. *Zavatt,* 289 F. 2d 46 (CA2 1961), Judge Friendly, writing for the majority, admitted that his exegesis of the history of the Court of Exchequer from the 12th to the 18th century "may seem to reek unduly of the study." *Id.,* at 48. Judge Clark, in dissent, quipped " 'if not of the museum,' " *id.,* at 59, and denounced the majority for constructing its argument for "unreal and unjustified" steps beginning with the attachment to the claim of "an inapt label, namely, that of the writ of debt," which "as set forth, say, in Chitty" did not look to Judge Clark like the modern statutory tax claims at issue. *Ibid.* He called this a "venture in nomenclature" and berated the majority for its fast reliance on "somewhat uncertain history" as well. *Ibid.*

To be sure, it is neither unusual nor embarrassing for members of a court to disagree and disagree vehemently. But it better behooves judges to disagree within the province of judicial expertise. Furthermore, inquiries into the appropriate historical analogs for the rights at issue are not necessarily susceptible of sound resolution under the best of circumstances. As one scholar observes: "[T]he line between law and equity (and therefore between jury and non-jury trial) was not a fixed and static one. There was a continual process of borrowing by one jurisdiction from the other; there were less frequent instances of a sloughing off of older functions. . . . The borrowing by each jurisdiction from the other was not accompanied by an equivalent sloughing off of functions. This led to a very large overlap between law and equity." James, Right to a Jury Trial in Civil Actions, 72 Yale L. J. 655, 658–659 (1963).

In addition, modern statutory rights did not exist in the 18th century, and even the most exacting historical research may not elicit a clear historical analog.[5] The right at issue here, for example, is a creature of modern labor law quite foreign to Georgian England. See *ante*, at 565–566. Justice Stewart recognized the perplexities involved in this task in his dissent in *Ross* v. *Bernhard, supra*, at 550, albeit drawing a different conclusion. "The fact is," he said, "that there are, for the most part, no such things as inherently 'legal issues' or inherently 'equitable issues.' There are only factual issues, and, 'like chameleons [they] take their color from surrounding circumstances.' Thus, the Court's 'nature of the

---

[5] See also McCoid, Procedural Reform and the Right to Jury Trial: A Study of *Beacon Theatres, Inc.* v. *Westover*, 116 U. Pa. L. Rev. 1, 2 (1967) ("[C]omplications stem from historical shifts and overlapping jurisdiction. Moreover, the careful historian encounters difficulty in applying the fruits of his study to contemporary civil litigation involving subject matter and procedural patterns unused, and sometimes unknown, in 1791") (footnotes omitted).

issue' approach is hardly meaningful."[6]   I have grappled with this kind of inquiry for three decades on this Court and have come to the realization that engaging in such inquiries is impracticable and unilluminating.

To rest the historical test required by the Seventh Amendment solely on the nature of the relief sought would not, of course, offer the federal courts a rule that is in all cases self-executing.   Courts will still be required to ask which remedies were traditionally available at law and which only in equity.   But this inquiry involves fewer variables and simpler choices, on the whole, and is far more manageable than the scholasticist debates in which we have been engaged.   Moreover, the rule I propose would remain true to the Seventh Amendment, as it is undisputed that, historically, "[j]urisdictional lines [between law and equity] were primarily a matter of remedy."   McCoid, Procedural Reform and the Right to Jury Trial: A Study of *Beacon Theatres, Inc.* v. *Westover*, 116 U. Pa. L. Rev. 1 (1967).   See also Redish, Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making, 70 Nw. U. L. Rev. 486, 490 (1975) ("In the majority of cases at common law, the equitable or legal nature of a suit was determined not by the substantive nature of the cause of action but by the remedy sought").[7]

---

[6] Quoting James, Right to a Jury Trial in Civil Actions, 72 Yale L. J. 655, 692 (1963).

[7] There are, to be sure, some who advocate abolishing the historical test altogether.   See, *e. g.*, Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn. L. Rev. 639, 742–747 (1973).   Contrary to the intimations in JUSTICE KENNEDY's dissent, see *post*, at 592–594, I am not among them.   I believe that it is imperative to retain a historical test for determining when parties have a right to jury trial for precisely the same reasons JUSTICE KENNEDY does.   It is mandated by the language of the Seventh Amendment and it is a bulwark against those who would restrict a right our forefathers held indispensable.   Like JUSTICE KENNEDY, I have no doubt that courts can and do look to legal history for the answers to

This is not to say that the resulting division between claims entitled to jury trials and claims not so entitled would exactly mirror the division between law and equity in England in 1791. But it is too late in the day for this Court to profess that the Seventh Amendment preserves the right to jury trial only in cases that would have been heard in the British law courts of the 18th century. See, e. g., *Curtis* v. *Loether*, 415 U. S., at 193 ("Although the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common-law forms of action recognized at that time"); *Beacon Theatres, Inc.* v. *Westover*, 359 U. S. 500 (1959) (rejecting the relevance of the chancellor's historic ability to decide legal claims incidental to a case brought in equity and holding that, in mixed cases, the parties are not only entitled to a jury trial on the legal claims but that this jury trial must precede a decision on the equitable claims — with the attendant collateral-estoppel effects); *Ross* v. *Bernhard*, 396 U. S. 531 (1970) (requiring a jury trial on the legal issues in a share-

constitutional questions, see *post*, at 593–594, and therefore the Seventh Amendment test I propose today obliges courts to do exactly that.

Where JUSTICE KENNEDY and I differ is in our evaluations of which historical test provides the more reliable results. That three learned Justices of the Supreme Court cannot arrive at the same conclusion in this very case, on what is essentially a question of fact, does not speak well for the judicial solvency of the current test. My concern is not merely the competence of courts to delve into this peculiarly recalcitrant aspect of legal history and certainly not, as JUSTICE KENNEDY summarizes it, the "competence of the Court to understand legal history" in general. *Post*, at 594. My concern is that all too often the first prong of the current test requires courts to measure modern statutory actions against 18th-century English actions so remote in form and concept that there is no firm basis for comparison. In such cases, the result is less the discovery of a historical analog than the manufacture of a historical fiction. By contrast, the nature of relief available today corresponds more directly to the nature of relief available in Georgian England. Thus the historical test I propose, focusing on the nature of the relief sought, is not only more manageable than the current test, it is more reliably grounded in history.

holders' derivative suit even though the procedurally equivalent suit in the 18th century would have been heard only in equity).

Indeed, given this Court's repeated insistence that the nature of the remedy is always to be given more weight than the nature of the historically analogous right, it is unlikely that the simplified Seventh Amendment analysis I propose will result in different decisions than the analysis in current use. In the unusual circumstance that the nature of the remedy could be characterized equally as legal or equitable, I submit that the comparison of a contemporary statutory action unheard of in the 18th century to some ill-fitting ancient writ is too shaky a basis for the resolution of an issue as significant as the availability of a trial by jury. If, in the rare case, a tie breaker is needed, let us break the tie in favor of jury trial.[8]

What Blackstone described as "the glory of the English law" and "the most transcendent privilege which any subject can enjoy," 3 W. Blackstone, Commentaries *379, was crucial in the eyes of those who founded this country. The encroachment on civil jury trial by colonial administrators was a "deeply divisive issue in the years just preceding the outbreak of hostilities between the colonies and England," and all 13 States reinstituted the right after hostilities ensued. Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn. L. Rev. 639, 654–655 (1973). "In fact, '[t]he right to trial by jury was probably the only one universally secured by the first American constitutions.'" Id., at 655 (quoting L. Levy, Freedom of Speech and Press in Early American History—Legacy of Suppression 281 (1963 reprint)). Fear of a Federal Government that had not guaran-

---

[8] See also *Granfinanciera, S. A.*, 492 U. S., at 92 (BLACKMUN, J., dissenting) ("The uncertainty in the historical record should lead us, for purposes of the present inquiry, to give the constitutional right to a jury trial the benefit of the doubt").

teed jury trial in civil cases, voiced first at the Philadelphia Convention in 1787 and regularly during the ratification debates, was the concern that precipitated the maelstrom over the need for a bill of rights in the United States Constitution. Wolfram, *supra*, at 657–660.

This Court has long recognized the caliber of this right. In *Parsons* v. *Bedford*, 3 Pet. 433, 446 (1830), Justice Story stressed: "The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy." Similarly, in *Jacob* v. *New York City*, 315 U. S. 752, 752–753 (1942), we said that "[t]he right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence . . . [a] right so fundamental and sacred to the citizen [that it] should be jealously guarded by the courts."

We can guard this right and save our courts from needless and intractable excursions into increasingly unfamiliar territory simply by retiring that prong of our Seventh Amendment test which we have already cast into a certain doubt. If we are not prepared to accord the nature of the historical analog sufficient weight for this factor to affect the outcome of our inquiry, except in the rarest of hypothetical cases, what reason do we have for insisting that federal judges proceed with this arduous inquiry? It is time we read the writing on the wall, especially as we ourselves put it there.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

Because I believe the Court has made this case unnecessarily difficult by exaggerating the importance of finding a precise common-law analogue to the duty of fair representation, I do not join Part III–A of its opinion. Ironically, by stressing the importance of identifying an exact analogue, the Court has diminished the utility of looking for any analogue.

As I have suggested in the past, I believe the duty of fair representation action resembles a common-law action against an attorney for malpractice more closely than it does any other form of action. See *United Parcel Service, Inc.* v. *Mitchell*, 451 U. S. 56, 74 (1981) (opinion concurring in part and dissenting in part). Of course, this action is not an exact counterpart to a malpractice suit. Indeed, by definition, no recently recognized form of action—whether the product of express congressional enactment or of judicial interpretation—can have a precise analog in 17th- or 18th-century English law. Were it otherwise the form of action would not in fact be "recently recognized."

But the Court surely overstates this action's similarity to an action against a trustee. Collective bargaining involves no settlor, no trust corpus, and no trust instrument executed to convey property to beneficiaries chosen at the settlor's pleasure. Nor are these distinctions reified matters of pure form. The law of trusts originated to expand the varieties of land ownership in feudal England, and evolved to protect the paternalistic beneficence of the wealthy, often between generations and always over time. See 1 W. Fratcher, Scott on Trusts § 1 (4th ed. 1987); L. Friedman, A History of American Law 212, 222–223 (1973). Beneficiaries are protected from their own judgment.[1] The attorney-client relationship, by contrast, advances the client's interests in dealings with adverse parties. Clients are saved from their lack of skill, but their judgment is honored. Union members, as a group, accordingly have the power to hire, fire, and direct the actions of their representatives—prerogatives anathema to the paternalistic forms of the equitable trust.[2]

---

[1] "The duties of the trustee are such as the creator of the trust may choose to impose; the interests of the beneficiaries are such as he may choose to confer upon them." 1 Fratcher, Scott on Trusts § 1, p. 2.

[2] Indeed, to make sense of the trust analogy, the majority must apparently be willing to assume that the union members, considered collectively, are both beneficiary and settlor, and that the settlor retains considerable

Equitable reasoning calibrated by the sophisticated judgment of the jurist, the accountant, and the chancellor is thus appropriately invoked when the impact of a trustee's conduct on the future interests of contingent remaindermen must be reviewed. However, the commonsense understanding of the jury, selected to represent the community, is appropriately invoked when disputes in the factory, the warehouse, and the garage must be resolved. In most duty of fair representation cases, the issues, which require an understanding of the realities of employment relationships, are typical grist for the jury's judgment. Indeed, the law defining the union's duty of fair representation has developed in cases tried to juries. Thus, *Vaca* v. *Sipes*, 386 U. S. 171 (1967), was itself a jury trial as were, for example, *Electrical Workers* v. *Foust*, 442 U. S. 42 (1979), and *Bowen* v. *United States Postal Service*, 459 U. S. 212 (1983).

As the Court correctly observed in *Curtis* v. *Loether*, 415 U. S. 189, 195 (1974), "in an ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right, a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." As I had occasion to remark at an earlier proceeding in the same case, the relevant historical question is not whether a suit was "specifically recognized at common law," but whether "the nature of the substantive right asserted . . . is analogous to common law rights" and whether the relief sought is "typical of an action at law." *Rogers* v. *Loether*, 467 F. 2d 1110, 1116–1117 (CA7 1972). Duty of fair representation suits are for the most part ordinary civil actions involving the stuff of contract and malpractice disputes. There is accordingly no ground for excluding these actions from the jury right.

In my view, the evolution of this doctrine through suits tried to juries, the useful analogy to common-law malpractice

---

power over the corpus, including the power to revoke the trust. That is an odd sort of trust.

cases, and the well-recognized duty to scrutinize any proposed curtailment of the right to a jury trial "with the utmost care," *ante*, at 565, provide a plainly sufficient basis for the Court's holding today. I therefore join its judgment and all of its opinion except for Part III–A.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, dissenting.

This case asks whether the Seventh Amendment guarantees the respondent union members a jury trial in a duty of fair representation action against their labor union. The Court is quite correct, in my view, in its formulation of the initial premises that must govern the case. Under *Curtis* v. *Loether*, 415 U. S. 189, 194 (1974), the right to a jury trial in a statutory action depends on the presence of "legal rights and remedies." To determine whether rights and remedies in a duty of fair representation action are legal in character, we must compare the action to the 18th-century cases permitted in the law courts of England, and we must examine the nature of the relief sought. See *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 42 (1989). I agree also with those Members of the Court who find that the duty of fair representation action resembles an equitable trust action more than a suit for malpractice. See *ante*, at 568–569.

I disagree with the analytic innovation of the Court that identification of the trust action as a model for modern duty of fair representation actions is insufficient to decide the case. The Seventh Amendment requires us to determine whether the duty of fair representation action "is more similar to cases that were tried in courts of law than to suits tried in courts of equity." *Tull* v. *United States*, 481 U. S. 412, 417 (1987). Having made this decision in favor of an equitable action, our inquiry should end. Because the Court disagrees with this proposition, I dissent.

## I

Both the Union and the respondents identify historical actions to which they find the duty of fair representation action most analogous. The Union contends that the action resembles a traditional equitable suit by a beneficiary against a trustee for failing to pursue a claim that he holds in trust. See, *e. g., Caffrey* v. *Darby*, 6 Ves. Jun. 489, 495–496, 31 Eng. Rep. 1159, 1162 (Ch. 1801); Restatement (Second) of Trusts § 205(a), and Illustration 2, pp. 458, 459 (1957) (Restatement). In other words, the Union compares itself to a trustee that, in its discretion, has decided not to press certain claims. The respondents argue that the duty of fair representation action resembles a traditional legal malpractice suit by a client against his lawyer for mishandling a claim. See, *e. g., Pitt* v. *Yalden*, 4 Burr. 2060, 98 Eng. Rep. 74 (K. B. 1767); *Russell* v. *Palmer*, 2 Wils. K. B. 325, 95 Eng. Rep. 837 (1767). They contend that the Union, when acting as their legal representative, had a duty to press their grievances.

JUSTICE MARSHALL, speaking for four Members of the Court, states an important and correct reason for finding the trust model better than the malpractice analogy. He observes that the client of an attorney, unlike a union member or beneficiary, controls the significant decisions concerning his litigation and can fire the attorney if not satisfied. See *ante,* at 568–569. Put another way, although a lawyer acts as an agent of his client, unions and trustees do not serve as agents of their members and beneficiaries in the conventional sense of being subject to their direction and control in pursuing claims. An individual union member cannot require his union to pursue a claim and cannot choose a different representative. See 29 U. S. C. § 159(a) (1982 ed.) (making the union elected by the employees in a bargaining unit the exclusive representative); *Vaca* v. *Sipes*, 386 U. S. 171, 177 (1967) (allowing a union to exercise discretion in fulfilling its duty of fair representation). A trustee, likewise, may exercise

proper discretion in deciding whether to press claims held in trust, see *Blue* v. *Marshall*, 3 P. Wms. 381, 383–384, 24 Eng. Rep. 1110, 1111 (Ch. 1735); Restatement, *supra*, § 192, and in general does not act as an agent of his beneficiaries, see *Taylor* v. *Davis*, 110 U. S. 330, 334–335 (1884) ("A trustee is not an agent. An agent represents and acts for his principal . . . . [A trustee] has no principal"); 1 A. Scott, Law of Trusts § 8, pp. 74–79 (3d ed. 1967) (distinguishing trustees from agents).

Further considerations fortify the conclusion that the trust analogy is the controlling one here. A union's duty of fair representation accords with a trustee's duty of impartiality. The duty of fair representation requires a union "to make an honest effort to serve the interests of all of [its] members, without hostility to any." *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 337 (1953). This standard may require a union to act for the benefit of employees who, as in this case, have antithetical interests. See Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich. L. Rev. 1, 21 (1958). Trust law, in a similar manner, long has required trustees to serve the interests of all beneficiaries with impartiality. See *Stuart* v. *Stuart*, 3 Beav. 430, 431, 49 Eng. Rep. 169, 169–170 (1841); Restatement, *supra*, § 183 ("When there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them"); 2 Scott, *supra*, § 183, pp. 1471–1472, and n. 2.

A lawyer's duty of loyalty is cast in different terms. Although the union is charged with the responsibility of reconciling the positions of its members, the lawyer's duty of loyalty long has precluded the representation of conflicting interests. See *Williams* v. *Reed*, 29 F. Cas. 1386, 1390 (No. 17,733) (CC Me. 1824) (Story, J.); H. Drinker, Legal Ethics 103 (1953) (describing the ancient history of the prohibition on simultaneous representation). A lawyer, at least absent knowing waiver by the parties, could not represent both the respondents and the senior laidoff workers as the

Union has done in this case. Cf. ABA Model Rules of Professional Conduct 1.7(b) (1984); ABA Model Code of Professional Responsibility DR 5-105(C) (1980).

The relief available in a duty of fair representation action also makes the trust action the better model. To remedy a breach of the duty of fair representation, a court must issue an award "fashioned to make the injured employee whole." *Electrical Workers* v. *Foust*, 442 U. S. 42, 49 (1979); see *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192, 206–207 (1944); *Vaca* v. *Sipes, supra*, at 187. The court may order an injunction compelling the union, if it is still able, to pursue the employee's claim, and may require monetary compensation, but it cannot award exemplary or punitive damages. See *Foust, supra*, at 52. This relief parallels the remedies prevailing in the courts of equity in actions against trustees for failing to pursue claims. See, *e. g.*, *Caffrey* v. *Darby, supra*, at 497, 31 Eng. Rep., at 1163 (ordering the trustee to make a beneficiary whole for failing to make a timely claims); see also Restatement, *supra*, § 205, and Comment *a;* G. Bogert & G. Bogert, Law of Trusts and Trustees § 862, p. 40, n. 10 (rev. 2d ed. 1982).

These remedies differ somewhat from those available in attorney malpractice actions. Because legal malpractice was a common-law claim, clients sued their attorneys for breach of professional obligations in the law courts. See R. Mallen & V. Levit, Legal Malpractice §§ 4 and 5, pp. 14–18 (2d ed. 1981). No one maintains that clients could obtain from these courts the injunctive relief offered in duty of fair representation actions. The evidence suggests that compensatory damages in malpractice cases resembled the monetary relief now awarded in duty of fair representation actions. See, *e. g.*, *Pitt* v. *Yalden, supra*, at 2062, 98 Eng. Rep., at 75–76 (opinion of Yates, J.) (discussing the measure of damages). Yet, as a historical matter, juries did have the authority to award exemplary damages in at least some tort actions. See *Browning-Ferris Industries* v. *Kelco Disposal, Inc.*, 492

U. S. 257, 274, and n. 20 (1989); *Curtis* v. *Loether*, 415 U. S.,
at 196. Although the parties have not cited any punitive
damages award in an attorney malpractice action prior to
1791, courts have awarded such damages since the 19th cen-
tury. See Mallen & Levit, *supra*, § 315, pp. 365–367; Wade,
The Attorney's Liability for Negligence, 12 Vand. L. Rev.
755, 772 (1959).

For all these reasons, the suit here resembles a trust ac-
tion, not a legal malpractice action. By this I do not imply
that a union acts as a trustee in all instances or that trust law,
as a general matter, should inform any particular aspects of
federal labor law. Obvious differences between a union and
a trustee will exist in other contexts. I would conclude only
that, under the analysis directed by our precedents, the re-
spondents may not insist on a jury trial. When all rights and
remedies are considered, their action resembles a suit heard
by the courts of equity more than a case heard by the courts
of law. See *Tull*, 481 U. S., at 417. From this alone it fol-
lows that the respondents have no jury trial right on their
duty of fair representation claims against the Union.

## II

The Court relies on two lines of precedents to overcome
the conclusion that the trust action should serve as the con-
trolling model. The first consists of cases in which the Court
has considered simplifications in litigation resulting from
modern procedural reforms in the federal courts. JUSTICE
MARSHALL asserts that these cases show that the Court
must look at the character of individual issues rather than
claims as a whole. See *ante*, at 569. The second line ad-
dresses the significance of the remedy in determining the
equitable or legal nature of an action for the purpose of choos-
ing the most appropriate analogy. Under these cases, the
Court decides that the respondents have a right to a jury
because they seek money damages. See *ante*, at 570–573.
These authorities do not support the Court's holding.

## A

In three cases we have found a right to trial by jury where there are legal claims that, for procedural reasons, a plaintiff could have or must have raised in the courts of equity before the systems merged. In *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500 (1959), Fox, a potential defendant threatened with legal antitrust claims, brought an action for declaratory and injunctive relief against Beacon, the likely plaintiff. Because only the courts of equity had offered such relief prior to the merger of the two court systems, Fox had thought that it could deprive Beacon of a jury trial. Beacon, however, raised the antitrust issues as counterclaims and sought a jury. We ruled that, because Beacon would have had a right to a jury trial on its antitrust claims, Fox could not deprive it of a jury merely by taking advantage of modern declaratory procedures to sue first. The result was consistent with the spirit of the Federal Rules of Civil Procedure, which allow liberal joinder of legal and equitable actions, and the Declaratory Judgment Act, 28 U. S. C. §§ 2201, 2202 (1982 ed.), which preserves the right to jury trial to both parties. See 359 U. S., at 509–510.

In *Dairy Queen, Inc.* v. *Wood,* 369 U. S. 469 (1962), we held, in a similar manner, that a plaintiff, by asking in his complaint for an equitable accounting for trademark infringement, could not deprive the defendant of a jury trial on contract claims subsumed within the accounting. Although a court of equity would have heard the contract claims as part of the accounting suit, we found them severable under modern procedure. See *id.,* at 477–479.

In *Ross* v. *Bernhard,* 396 U. S. 531 (1970), a shareholder-plaintiff demanded a jury trial in a derivative action asserting a legal claim on behalf of his corporation. The defendant opposed a jury trial. In deciding the case, we recognized that only the courts of equity had procedural devices allowing shareholders to raise a corporation's claims. We nonetheless

again ruled that modern procedure allowed trial of the legal claim to a jury. See *id.*, at 542.

These three cases responded to the difficulties created by a merged court system. See McCoid, Procedural Reform and the Right to Jury Trial: A Study of *Beacon Theatres, Inc.* v. *Westover*, 116 U. Pa. L. Rev. 1 (1967). They stand for the proposition that, because distinct courts of equity no longer exist, the possibility or necessity of using former equitable procedures to press a legal claim no longer will determine the right to a jury. JUSTICE MARSHALL reads these cases to require a jury trial whenever a cause of action contains legal issues and would require a jury trial in this case because the respondents must prove a breach of the collective-bargaining agreement as one element of their claim. See *ante*, at 569–570.

I disagree. The respondents, as shown above, are asserting an equitable claim. Having reached this conclusion, the *Beacon, Dairy Queen,* and *Ross* cases are inapplicable. Although we have divided self-standing legal claims from equitable declaratory, accounting, and derivative procedures, we have never parsed legal elements out of equitable claims absent specific procedural justifications. Actions which, beyond all question, are equitable in nature may involve some predicate inquiry that would be submitted to a jury in other contexts. For example, just as the plaintiff in a duty of fair representation action against his union must show breach of the collective-bargaining agreement as an initial matter, in an action against a trustee for failing to pursue a claim the beneficiary must show that the claim had some merit. See 3 A. Scott, Law of Trusts § 192, pp. 1589–1590, and n. 6 (3d ed. 1967). But the question of the claim's validity, even if the claim raises contract issues, would not bring the jury right into play in a suit against a trustee.

Our own writing confirms the consistency of this view with respect to the action before us. We have not deemed the elements of a duty of fair representation action to be independent of each other. Proving breach of the collective-

bargaining agreement is but a preliminary and indispensable step to obtaining relief in a duty of fair representation action. We have characterized the breach-of-contract and duty issues as "inextricably interdependent" and have said that "[t]o prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union." *DelCostello* v. *Teamsters*, 462 U. S. 151, 164–165 (1983) (internal quotation marks omitted). The absence of distinct equitable courts provides no procedural reason for wresting one of these elements from the other.

## B

The Court also rules that, despite the appropriateness of the trust analogy as a whole, the respondents have a right to a jury trial because they seek money damages. See *ante,* at 570–573. The nature of the remedy remains a factor of considerable importance in determining whether a statutory action had a legal or equitable analog in 1791, but we have not adopted a rule that a statutory action permitting damages is by definition more analogous to a legal action than to any equitable suit. In each case, we look to the remedy to determine whether, taken with other factors, it places an action within the definition of "Suits at common law."

In *Curtis*, 415 U. S., at 195–196, for example, we ruled that the availability of actual and punitive damages made a statutory antidiscrimination action resemble a legal tort action more than any equitable action. We made explicit that we did not "go so far as to say that any award of monetary relief must necessarily be 'legal' relief." *Id.,* at 196. Although monetary damages might cause some statutory actions to resemble tort suits, the presence of monetary damages in this duty of fair representation action does not make it more analogous to a legal action than to an equitable action. Indeed, as shown above, the injunctive and monetary reme-

dies available make the duty of fair representation suit less analogous to a malpractice action than to a suit against a trustee.

In *Tull*, 481 U. S., at 422, the availability of damages again played a critical role in determining the right to a jury trial. In an environmental suit by the Government for injunctive relief and a civil penalty, both an equitable public nuisance action and a legal action in debt seemed appropriate histori-cal models. We decided between them by noting that only the courts of law could award civil penalties. See *id.*, at 422–425. In the present case, however, one cannot char-acterize both the trust analogy and the legal malpractice comparisons as appropriate; the considerations discussed above, including the remedy available, all make the trust model superior. As we stated in *Tull*, "[o]ur search is for a single historical analog, taking into consideration the nature of the cause of action and the remedy as two important fac-tors." *Id.*, at 422, n. 6. The trust action alone satisfies this standard.

In *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989), we again found the presence of monetary relief critical in determining the nature of a statutory action as a whole. We held that, despite some evidence that both the courts of law and equity had jurisdiction over fraudulent conveyances, only a court of law could entertain an action to recover an alleged fraudulent transfer of a determinate sum of money. See *id.*, at 43–47. As in *Curtis* and *Tull*, however, the particular importance of monetary damages in *Granfinanciera* does not carry forward into this case. The courts of equity could and did award the kind of damages sought by the respondents here. The respondents' mere request for backpay in no way entitles them to a jury under the Seventh Amendment.

## III

The Court must adhere to the historical test in determining the right to a jury because the language of the Constitution

requires it. The Seventh Amendment "preserves" the right to jury trial in civil cases. We cannot preserve a right existing in 1791 unless we look to history to identify it. Our precedents are in full agreement with this reasoning and insist on adherence to the historical test. No alternatives short of rewriting the Constitution exist. See F. James, Civil Procedure § 8.5, p. 352 (1965) ("For good or evil, both the constitutio[n] and the charters of the merged procedure embody the policy judgment, quite deliberately made, to leave the extent of jury trial about where history had come to place it"); Shapiro & Coquillette, The Fetish of Jury Trial in Civil Cases: A Comment on *Rachal* v. *Hill*, 85 Harv. L. Rev. 442, 449 (1971) ("Even the most ardent critic of any historical test would concede that matters that would have fallen entirely within the jurisdiction of a court of equity or admiralty in 1791 do not come within the definition of a suit at 'common law' under the seventh amendment"). If we abandon the plain language of the Constitution to expand the jury right, we may expect Courts with opposing views to curtail it in the future.

It is true that a historical inquiry into the distinction between law and equity may require us to enter into a domain becoming less familiar with time. Two centuries have passed since the Seventh Amendment's ratification, and the incompleteness of our historical records makes it difficult to know the nature of certain actions in 1791. The historical test, nonetheless, has received more criticism than it deserves. Although our application of the analysis in some cases may seem biased in favor of jury trials, the test has not become a nullity. We do not require juries in all statutory actions. See, *e. g.*, *Lehman* v. *Nakshian*, 453 U. S. 156, 162, n. 9 (1981) (no jury trial right in suits against the United States); *Katchen* v. *Landy*, 382 U. S. 323, 337–340 (1966) (no jury trial right on certain bankruptcy claims); *Luria* v. *United States*, 231 U. S. 9, 27–28 (1913) (no jury trial right in action to cancel naturalization). The historical test, in fact, resolves most cases without difficulty. See C. Wright, Law

of Federal Courts § 92, p. 609 (4th ed. 1983) ("[T]he vast and controversial literature that has developed as to the scope of the jury right is, fortunately, not in proportion to the practical importance of the problem in the actual working of the courts").

I would hesitate to abandon or curtail the historical test out of concern for the competence of the Court to understand legal history. We do look to history for the answers to constitutional questions. See, e. g., *Fay* v. *Noia,* 372 U. S. 391, 399–415 (1963) (opinion of BRENNAN, J.); *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 260–302 (1985) (BRENNAN, J., dissenting). Although opinions will differ on what this history shows, the approach has no less validity in the Seventh Amendment context than elsewhere.

If Congress has not provided for a jury trial, we are confined to the Seventh Amendment to determine whether one is required. Our own views respecting the wisdom of using a jury should be put aside. Like JUSTICE BRENNAN, I admire the jury process. Other judges have taken the opposite view. See, e. g., J. Frank, Law and the Modern Mind 170–185 (1931). But the judgment of our own times is not always preferable to the lessons of history. Our whole constitutional experience teaches that history must inform the judicial inquiry. Our obligation to the Constitution and its Bill of Rights, no less than the compact we have with the generation that wrote them for us, do not permit us to disregard provisions that some may think to be mere matters of historical form.

IV

Because of the employer's bankruptcy, the respondents are proceeding only against the Union in the suit before us. In a typical duty of fair representation action, however, union members may sue both their union and their employer. See *Vaca* v. *Sipes,* 386 U. S., at 186. The Union argues that a duty of fair representation action against an employer also would have an equitable character because it resembles an-

other trust action entertained in the courts of equity. It contends that, if a trustee fails to pursue a claim according to his duty, the beneficiary may join the trustee and the third party in one action and assert in his own name both the claim of breach of fiduciary duty and the claim against the third party. See Restatement § 282(1), p. 44 (1957); 4 A. Scott, Law of Trusts § 282.1, pp. 2338–2340 (3d ed. 1967); *Bowen* v. *United States Postal Service,* 459 U. S. 212, 243 (1983) (WHITE, J., concurring in judgment in part and dissenting in part). In this case, we do not have to determine the correctness of this analogy, nor must we decide whether *Beacon, Dairy Queen,* or *Ross* would require a jury trial in a suit against an employer. I would deny a jury trial to the respondents here, but would leave these other questions for a later time. Because the Court has reached a different result, I dissent.