Calvin GROOMS, Plaintiff,

v.

WIREGRASS ELECTRIC COOPERA-TIVE, INC., an Alabama Corporation; International Brotherhood of Electrical Workers, Local 2152, Defendants.

No. CV94–D–836–S.

United States District Court, M.D. Alabama, Southern Division.

Feb. 17, 1995.

Malcolm Rance Newman, Dothan, AL, for plaintiff.

Edward M. Price, Jr. and Elizabeth B. Glasgow, Dothan, AL, for defendant Wiregrass.

John Lee Quinn, Birmingham, AL, for defendant Local 2152.

## MEMORANDUM OPINION AND ORDER

De MENT, District Judge.

This matter is before the court on the defendants' motions for summary judgment accompanied by supporting briefs, exhibits and affidavits. The defendants, Wiregrass Electric Cooperative and International Brotherhood of Electrical Workers, Local 2152, filed their individual motions on December 9, 1994. The court *construes Wiregrass Electric Cooperative's motion as a motion for partial summary judgment.*[1] On December 30, 1994, the plaintiff, Calvin Grooms, filed a reply brief and an affidavit in opposition thereto, to which the defendants responded on January 9, 1995.

Because the defendants' motions involve similar issues and arise from the same set of facts, the court will consolidate the motions and address them simultaneously. After careful consideration of the arguments of counsel, the relevant case law and the record as a whole, the court issues the following memorandum opinion.

## JURISDICTION

Based upon 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1337(a) (action arising under an Act of Congress), 28 U.S.C. § 1343 (action based upon alleged deprivation of civil rights) and 42 U.S.C. § 2000e–5(f)(3) (actions arising under Title VII), the court properly exercises subject matter jurisdiction over this action. The parties do not contest personal jurisdiction or venue.

## FACTS

The plaintiff, a black male, commenced this action on July 5, 1994 against Wiregrass Electric Cooperative (hereafter the "cooperative"), asserting race discrimination claims under 42 U.S.C. § 1981, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e–17, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Specifically, the plaintiff claims that the cooperative wrongfully terminated him and denied him several promotions. The plaintiff also brings a claim against International Brotherhood of Electrical Workers, Local 2152 (hereafter "Union"), contending that it breached the duty of fair representation in refusing to arbitrate the plaintiff's claim and that said refusal was motivated by racial animus.

For nineteen years, the plaintiff was employed by the cooperative and worked as a heavy equipment operator. At all times material to this action, the plaintiff was a member of the Union, an unincorporated association and labor organization within the meaning of 29 U.S.C. §§ 152(5), 185(a). The Union is the exclusive bargaining representative of certain employees of the cooperative. On April 30, 1993, the plaintiff was discharged from his employment after testing positive for marijuana on a mandatory drug test.

Under federal law, the cooperative is required to institute a mandatory drug testing program for all employees who hold commercial motor vehicle drivers' licenses. *See* 49 C.F.R. §§ 391.93, 391.95 [Department of Transportation regulations (hereafter "D.O.T.")]. An employee who tests positive for controlled substances is thereby rendered "unqualified" to operate a commercial motor vehicle:

(b) No driver shall be on duty, ... if the driver tests positive for use of controlled

---

1. The plaintiff, a black male, also has brought race claims against Wiregrass Electrical Cooperative based upon discrimination in hiring and promotions. Pl.'s Compl. at ¶ 8, 9. That is, the plaintiff asserts that despite his "good performance evaluations," white employees whom he had trained were promoted over him. Pl.'s Resp. to Def.s' Mot. Summ.J., Ex. A attached thereto (Pl.'s Aff.). The plaintiff has predicated relief under both 42 U.S.C. § 1981 and Title VII.

Wiregrass Electrical Cooperative, however, has not addressed these claims in its motion; thus, the court need not determine the merit thereof. The court simply notes that because these issues are not properly before the court on motion for summary judgment, the case will proceed as to the plaintiff's Title VII and § 1981 claims based upon discrimination in hiring and promotions.

substances, except as provided in § 391.97 of this part [regarding prescription drugs].

(c) A person who tests positive for the use of a controlled substance, as defined in 49 CFR part 40 [marijuana, cocaine, opiates, amphetamines and phencyclidine (PCP) ], is medically unqualified to operate a commercial motor vehicle.

49 C.F.R. § 391.95(b) and (c) (brackets supplied).

The dates and corresponding events leading up to the plaintiff's termination are as follows:

1) *September 10, 1992:* —The plaintiff was randomly selected for drug testing.[2]

2) *September 15, 1992* —An independent laboratory conducted the drug testing. Under the D.O.T. regulations, said laboratory is certified by the federal government for mandatory drug testing. *See* The cooperative's Mem.Supp. of Mot.Summ.J., Ex. E attached thereto. The plaintiff's test results confirmed positive for cannabinoids (i.e., marijuana). *See id.,* Ex. B attached thereto (letter from laboratory).

3) *September 16, 1992* —The plaintiff was notified of the test results, and the cooperative immediately suspended the plaintiff from operating a commercial motor vehicle.

4) *September 16, 1992* —The plaintiff talked to the doctor who performed the test. Upon inquiry, the doctor informed the plaintiff that it could take seven to thirty days for marijuana to dissipate from system. *See* Pl.'s Dep. at 68, 76.

5) *September 18, 1992* —The plaintiff took a leave of absence and obtained and paid for a "re-test." This test was conducted by a certified lab.

6) *September 25, 1992* —Test results confirmed negative for controlled substances; thus, the cooperative reinstated the plaintiff to his position. *See* Pl.'s Mem.Opp. to Def.s' Mot.Summ.J., Ex. B attached thereto (letter from Med Care South).

7) *October 1, 1992* —The plaintiff filed a grievance with the Union for backpay for his leave of absence following the September drug test. *See* Pl.'s Dep. at 114–115, 70–72.

8) *April 14, 1993* —The cooperative implemented mandatory drug testing for all employees, who operated commercial motor vehicles.

9) *April 26, 1993* —The plaintiff's test results reported positive for marijuana. Again, the cooperative immediately suspended the plaintiff. *See* The cooperative's Mem.Supp. of Mot.Summ.J., Ex. C attached thereto.

10) *April 30, 1993* —The cooperative fired the plaintiff. *See id.,* Ex. D attached thereto (letter of termination).

The cooperative employed the following procedure for the selection of employees for drug testing on September 10, 1992: The names of all employees with commercial motor vehicle drivers' licenses subject to drug testing were listed alphabetically in a computer and assigned a number. Through the use of a computer software system, the operator lists the total number of employees eligible and the number to be tested for that sample. The computer then randomly selects numbers, which are matched to the employees' names. *Id.,* Ex. F attached thereto (Cary Hatcher's Aff.). Cleveland Turner, a union representative, was present for the selection process and furnished the list of selected employees to Johnny Crutchfield, the safety director. *Id.*

Each selected employee provided a urine specimen for testing. Both the drawing and analysis of the urine samples were conducted by the independent laboratory without the involvement of any of the cooperative's employees. The cooperative's Mem. in Supp. Mot.Summ.J., Ex. A attached thereto (Jerry Mosely's Aff.). The plaintiff does not challenge the right of the cooperative to require drug testing but rather asserts that his test results were somehow faulty and that the cooperative, in an attempt to disguise its

---

**2.** Under the D.O.T. regulations, *"random selection process* means that drug tests are unannounced and that every commercial motor vehicle driver of a motor carrier has an equal chance of being selected for testing." 49 C.F.R. § 391.85. As discussed *infra,* the plaintiff does not contest the validity of the cooperative's selection process or testing procedures.

racial animus, used those results as a subterfuge for firing him.

The plaintiff's complaint against the Union arises from the following facts: The cooperative and the Union have been privy to a series of collective-bargaining agreements, including an agreement effective July 15, 1991 through July 14, 1994. Noble R. Dean's Aff. at ¶ 1–2.[3] Among the terms and conditions of said collective bargaining agreement were procedures for processing and arbitrating employee grievances. *Id.* at ¶ 7, Ex. E.

Pursuant to the Union's Constitution and Bylaws, individual employees represented by the Union have the right to initiate grievances under the collection-bargaining agreement and may pursue internal appeals of the grievance process. *Id.* at ¶ 7. The plaintiff filed a grievance on May 6, 1993, asserting that his termination on April 26, 1993 was without just cause. His grievance was processed through all steps of the grievance procedure.[4] Pl.'s Dep. at 79, 126–127, 130.

The cooperative denied the grievance at the final step of the procedure. Hence, the Union appealed the plaintiff's grievance to arbitration to preserve contractual time limits pending further review by the Union's Executive Board. The Union's Executive Board met and discussed the plaintiff's grievance on August 2, 1993. Thereafter, the Executive Board of the Union concluded that it did not have a reasonable chance of prevailing in arbitration and opted to withdraw the grievance without prejudice. Dean's Aff. at ¶ 5. On or about August 5, 1993, the plaintiff received a letter from Dean advising him of the Union's decision not to proceed to arbitration. Dean's Aff at ¶ 6; Pl.'s Dep. at 115–116. Thereafter, the plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission (hereafter "EEOC") and received a right-to-sue letter on or about May 6, 1994.

**3.** Noble R. Dean (hereafter "Dean") is the president of the local union.

**4.** While the plaintiff's grievance was processing, Dean requested that the cooperative reinstate the plaintiff to a job that did not require a commer-

## SUMMARY JUDGMENT STANDARD

██ Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In further elaboration on the summary judgment standard, the Supreme Court has said that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510. *See also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989). The court is to construe the evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

cial motor vehicle driver's license. The plaintiff refused the job because it would have resulted in a pay cut. Pl.'s Dep. at 126–127; *see also* Dean's Aff. at ¶ 5.

## DISCUSSION

### I. TITLE VII: ADMINISTRATIVE REMEDIES

■ The court finds that as to the plaintiff's Title VII wrongful termination claim, the plaintiff has met all precedent administrative requirements for bringing suit in federal court. The plaintiff timely filed charges with the EEOC against the cooperative. After receiving a right-to-sue letter from the EEOC, the plaintiff filed this lawsuit within ninety days.[5] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973) (stating that federal courts have jurisdiction to hear Title VII claims when a plaintiff has (1) filed timely charges of employment discrimination with the EEOC **and** (2) receives and acts upon the EEOC's statutory notice of the right to sue).

### II. ACTIONS BROUGHT UNDER 42 U.S.C. § 1981

■ The court notes that the plaintiff also has properly predicated liability under 42 U.S.C. § 1981 for wrongful termination. In 1991, the Civil Rights Act (hereafter the "Act") was amended, expanding the coverage of 42 U.S.C. § 1981 to include claims of racial discrimination based upon wrongful termination. Pub.L. No. 102–166, S. 1745, 102d Cong., 1st Sess. (1991). (Congress passed the Act on November 7, 1991, which was signed into law on November 21, 1991, by former President George Bush.) Prior to The Act's enactment, the Supreme Court of the United States narrowly construed the right "to make and enforce contracts" as that language is used in § 1981, holding that § 1981 "does not extend ... to conduct by the employer after the contract relation has been established," unless a claim was for denial of a promotion which "involved the opportunity to enter into a new contract with the employer." *Patterson v. McLean Credit Union,* 491 U.S. 164, 177 and 185, 109 S.Ct. 2363, 2372 and 2377, 105 L.Ed.2d 132 (1989). The Act single-handedly reverses *Patterson* and its progeny and now permits claims for intentional racial discrimination in "... the making, performance, modification, and termination of [employment] contracts," as well as "... the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Hence, the Act maximizes the overlap between Title VII and § 1981 and allows an aggrieved employee alleging intentional discrimination to alternatively seek recourse under both statutes.[6]

### III. DEFENDANT WIREGRASS ELECTRIC COOPERATIVE'S MOTION FOR SUMMARY JUDGMENT

#### A. *Wrongful Termination*

■ In an action alleging disparate treatment under either Title VII or § 1981, an aggrieved employee must prove an intentional discriminatory motive by presenting either direct evidence or circumstantial evidence or racial animus. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993); *see e.g. Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 771–72 (11th Cir.1982). Absent direct evidence, as is the case here, a plaintiff can establish intentional discrimination under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Bur-*

5. Once an aggrieved party has received a right-to-sue notice from the EEOC, the party has ninety days to bring a civil action against the respondent named in the charge. 42 U.S.C. § 2000e–5(f)(1). The ninety-day time frame is jurisdictional, and with a few exceptions not relevant here, the ninety-day period begins to run from the date the plaintiff receives the notice. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1160 (11th Cir.1993).

6. The court notes that suits for racial discrimination predicated on § 1981 will continued to be favored over Title VII: Damages for compensatory and punitive damages are not capped if the employee-plaintiff can recover under § 1981, and the employee-plaintiff may circumvent Title VII's administrative mechanisms, which encourage reconciliation without a lawsuit. *See* 42 U.S.C. § 1981a(b)(3), which caps damages available under Title VII from $50,000 to $300,000, depending upon the size of the employer's workforce; *See also id.* at (b)(4), which specifically states that "[n]othing in this section shall be construed to limit the scope of, or the relief available under [§ 1981]."

*dine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Under the *McDonnell Douglas* and *Burdine* framework, a plaintiff must

create an inference of discrimination by establishing a prima facie case. If he [or she] does so, the defendant must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." The plaintiff may then attempt to show that these reasons are pretextual or may present other evidence to show that discriminatory intent was more likely the cause of the employer's actions.

*Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984) (citations omitted).

■ Accordingly, the plaintiff must first meet his burden of establishing a prima facie case of wrongful termination. The plaintiff, in claiming that the cooperative wrongfully terminated him, must establish the following: (1) that he belongs to a protected class; (2) that he was qualified for the position he held; (3) that he was discharged; and (4) that a person from outside his protected group replaced him or that the position was left open. *See Mauter v. Hardy Corp.,* 825 F.2d 1554, 1556 (11th Cir.1987). As to the fourth element, the Court of Appeals for the Eleventh Circuit has recently confirmed that a plaintiff cannot make out a prima facie case if he or she does not prove by a preponderance of the evidence that the position was **in fact** "awarded to a person of a non-protected class." *Green v. School Bd. of Hillsborough County, Fla.,* 25 F.3d 974, 978 (11th Cir. 1994).

### B. *Analysis*

■ Here, the first and third elements are not in dispute: The plaintiff, who is black, is obviously within a protected class and was terminated on April 30, 1993. As to the third and fourth factors, the court finds that the plaintiff has failed to create a genuine issue of material fact so as to preclude the granting of summary judgment. The plaintiff admits that a negative drug test is a condition precedent under federal law for driving a commercial motor vehicle and that

the two urine samples on the test dates in question were positive for marijuana. The crux of the plaintiff's argument, however, is that both test results were conclusively "false-positive" and that "but for" the two false-positive drug tests, he would be qualified for the position of a commercial vehicle operator. Hence, while the plaintiff does not expressly so state, his implied argument is this or this in substance: The cooperative, either directly or indirectly, manipulated the testing procedure and/or test results. By doing so, the cooperative could then fire him and cover up its racial animus, thereby avoiding any adverse legal consequences.

As to the September 1992 alleged "false-positive" test result, the court simply cannot follow the plaintiff's logic. Even if everything that the plaintiff asserts is true, proven and correct, there is not a scintilla of evidence that the cooperative discriminated against him because he was black. From aught that appears, the cooperative did what ought to be done when faced with an employee's allegations that a drug test result may be false positive. Upon receiving the negative test results subsequently obtained by the plaintiff from an independent lab, the cooperative immediately reinstated the plaintiff to his position as a commercial motor vehicle driver.

The plaintiff further asserts that because his "re-test" obtained after the April drug test was negative, this is irrefutable evidence that the cooperative's September test, as well as the April test, was erroneous and/or fraudulent. The court likewise finds this reasoning faulty. The plaintiff has not set forth any evidence, statistical or otherwise, to demonstrate any impropriety or indiscretion in the cooperative's drug testing program and procedures. Moreover, the plaintiff has failed to raise a genuine issue of material fact as to the cooperative's allegations that both the drawing and analysis of the urine specimen is conducted by an independent laboratory, certified by the federal government to administer said drug tests. Because the evidence shows that the cooperative did not participate in the testing procedure, the court finds that the plaintiff has failed to

demonstrate how he is the object of racial discrimination.

Moreover, the plaintiff has failed to establish the fourth element of his prima facie case in that there is no evidence that his position was **in fact** awarded to a person of a non-protected class. The plaintiff never addresses the issue, and the record is devoid of any evidence that an employee outside the protected class replaced him or even that the position remained vacant. *See Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1391 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983) (holding that "a plaintiff ... cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact").

The plaintiff also may establish the fourth element of his prima facie case by showing "... that the misconduct for which [he] was discharged was nearly identical to that engaged in" by a white employee who was not fired. *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. Unit B 1982) (brackets supplied). *See also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (holding that an employer would violate Title VII if it discharged a black employee who participated in a theft while retaining a white employee who was guilty of the same offense).

Here, the plaintiff asserts that other white males at the cooperative, i.e., Crutchfield and Greg Bettis, had "bona fide" drug problems and were not discharged. *See* Pl.'s Resp. to Def.s' Mot.Summ.J., Ex. A attached thereto (Pl.'s Aff.) Even when taking all the facts in the light most favorable to the plaintiff, the plaintiff has failed to produce any evidence that the aforementioned employees were similarly situated, i.e., that Crutchfield and Bet-tis retained a commercial motor vehicle driver's license, thereby requiring them to be tested. Even assuming that Crutchfield and Bettis did undergo drug testing, the plaintiff has not set forth any admissible facts or evidence that either employee tested positive for drugs and was not discharged.[7] After an exacting review of the record, the court finds that the plaintiff has failed to show that the "misconduct" for which the plaintiff was ultimately terminated was "nearly identical" to the conduct of Crutchfield and Bettis.

Even assuming, *arguendo*, that the plaintiff satisfied his prima facie case, the cooperative has asserted a legitimate, nondiscriminatory reason for its action. The cooperative in instituting a federally-mandated drug testing program in compliance with the law should be allowed to take action and rely upon the results. In addition, pursuant to the D.O.T. regulations, a positive drug test renders an employee "unqualified" to hold a commercial motor vehicle drivers license. Here, the plaintiff, in testing positive for drugs, no longer met the minimum requirements of his job. In fact, an employer may not permit an employee to drive if said employee tests positive for the use of controlled substances. *See* 49 C.F.R. § 391.95(b).

Moreover, the cooperative's action is in accord with the purposes of the D.O.T. regulations, i.e., "to reduce highway accidents that result from driver use of controlled substances, thereby reducing fatalities, injuries, and property damage." 49 C.F.R. § 391.81(a). A further public policy reason supports the cooperative's decision to terminate the plaintiff: An employer who retains an employee who has tested positive for controlled substances potentially could face enormous tort liability if that employee endangers third parties while acting in the line and scope of his employee relationship.

The court further finds that the plaintiff has not demonstrated that the cooperative's

---

7. The plaintiff testified at his deposition that there was a rumor that Bettis tested positive on a company drug test. Specifically, the plaintiff asserted that another employee (Roger Simmons) told him that Bettis tested positive for drugs and was in rehabilitation. *See* Pl.'s Dep. at 59–63. As the defendant correctly points out, this statement is clearly hearsay and is not properly be-fore the court. *Federal Rule of Civil Procedure* 56(e) unambiguously recites that all affidavits opposing summary judgment must be based upon "personal knowledge, [and] shall set forth facts as would be admissible in evidence...." Admissible evidence, as explained in the *Federal Rules of Evidence*, does not include hearsay. Fed.R.Evid. 801(c).

reasons are "pretextual" or that a "discriminatory intent was more likely the cause of the employer's actions." *Nix*, 738 F.2d at 1184; *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (holding that "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted"). Accordingly, the court finds that summary judgment is due to be granted against the plaintiff as to the plaintiff's wrongful termination claim against the cooperative.

## IV. DEFENDANT INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 2152'S MOTION FOR SUMMARY JUDGMENT

The plaintiff further asserts a violation of the duty of fair representation against the Union "for its failure to adequate[ly] represent [the] Plaintiff in the grievance process even though [the] Plaintiff was a dues-paying member in good standing when he sought ... help" from the Union. Pl.'s Compl. at ¶ 11 (brackets supplied). Specifically, the plaintiff asserts that the Union, in refusing to prosecute his grievance claim, exercised its discretion in a racially-discriminatory manner and "could not see anything beyond his skin color...." Pl.'s Resp. to Def.s' Mot. Summ.J. at 3. In urging summary judgment, the Union asserts that the plaintiff's claim is time-barred, that the plaintiff failed to exhaust the Union's contractual grievance procedure and internal review thereof before filing suit and that, in any event, the Union did not breach its duty of fair representation.

 The Supreme Court has long recognized a union's statutory duty to " 'to serve the interest of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' " *Breininger v. Sheet Metal Workers Int'l*, 493 U.S. 67, 73, 110 S.Ct. 424, 429, 107 L.Ed.2d 388 (1989) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967)). To prevail on a claim for breach of duty of fair representation, the plaintiff must

show that the handling of the grievance was "arbitrary, discriminatory or in bad faith." *Airline Pilots Assoc. v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991). In other words, "[a] union does not breach its duty of fair representation ... through simple negligence or a mistake in judgment." *Landry v. The Cooper/T.Smith Stevedoring Co.*, 880 F.2d 846, 852 (5th Cir. 1989) (citing *Vaca*, 386 U.S. at 192–93, 87 S.Ct. at 918).

At the outset the court points out that the Union, in relying on *Vaca*, mischaracterizes the plaintiff's claim as a "hybrid" § 301/fair representation claim. That is, the Union asserts that the plaintiff's claim is based in part on breach of contract of the collective-bargaining agreement between the Union and the employer, actionable under § 301 of the Labor Management Relations Act (hereafter "LMRA"), and in part on a breach of the Union's duty of fair representation. *See* Union's Mem. in Supp. of Mot.Summ.J. at 2, footnote 1. In so asserting, the Union claims that the plaintiff must prove both that the cooperative breached the contract and that the Union breached its duty of fair representation.

The court finds that the defendant's reliance on *Vaca* is misplaced. As stated by the Supreme Court in *Breininger*:

> Our reasoning in *Vaca* in no way implies ... that a fair representation action requires a concomitant claim against an employer for breach of contract. Indeed, the earliest fair representation suits involved claims against unions for breach of the duty in *negotiating* a collective-bargaining agreement, a context in which no breach-of-contract action against an employer is possible.... Even after a collective-bargaining agreement has been signed, we have never required a fair representation plaintiff to allege that his *employer* breached the agreement in order to prevail.

*Id.* 493 U.S. at 81, 110 S.Ct. at 433 (citations omitted) (emphasis in original).[8]

---

8. The court need not determine whether the plaintiff's position makes out a § 301 claim. The court simply notes that the complaint does not

allege a breach of contract claim against the employer, i.e., the cooperative. *See Breininger*, 493 U.S. at 81 n. 7, 110 S.Ct. at 433 n. 7.

While a union has great discretion in deciding whether to arbitrate, the court does not agree that the plaintiff's claim is barred for failure to exhaust contractual remedies. The *Breininger* court clearly articulates that "... where the union has control of the grievance and arbitration system, the employee-plaintiff's failure to exhaust his contractual remedies may be excused if the union has wrongfully refused to process his claims and thus breached its duty of fair representation." *Id.* at 80, 110 S.Ct. at 433 (citing *Vaca*, 386 U.S. at 185–86, 87 S.Ct. at 914).

The court, however, need not address whether such a violation has occurred as the plaintiff's claim is time barred by the six-month statute of limitations applicable to fair representation claims. The six-month statute of limitation derives from § 10(b) of the NLRA and applies to claims arising from a breach of the duty of fair representation. *Clarke v. Laborers' Int'l Union of North America*, 916 F.2d 1539, 1543 n. 3 (11th Cir.1990); *see also Local No. 391 v. Terry*, 494 U.S. 558, 567 n. 5, 110 S.Ct. 1339, 1345 n. 5, 108 L.Ed.2d 519 (1990). The statute begins to run when the plaintiff either knew or should have known of the injury itself, i.e., the breach of duty of fair representation. *Degan v. Ford Motor Co.*, 869 F.2d 889, 892–93 (5th Cir.1989).

Here, the plaintiff alleges that the Union breached its duty of fair representation by failing to take the plaintiff's 1993 grievance to arbitration. The plaintiff knew or should have known no later than August 5, 1993, the date the plaintiff received a letter advising him of the Union's decision not to proceed to arbitration. Hence, the six-month statute of limitation began running on August 5, 1993 and expired on February 5, 1994. The plaintiff, however, did not file a claim until July 5, 1994, eleven months after the statute began to run. Because the court cannot hear the plaintiff's lawsuit against the Union, summary judgment is due to be granted in favor of the Union.

**9.** Because the cooperative failed to address these claims in its motion for summary judgment, the

## CONCLUSION

For the foregoing reasons, it is CONSIDERED and ORDERED that summary judgment be and the same is hereby GRANTED in favor of International Brotherhood of Electrical Workers, Local 2152, and against the plaintiff Calvin Grooms, and that the plaintiff take nothing by his said suit against defendant International Brotherhood of Electrical Workers, Local 2152.

It is further CONSIDERED and ORDERED that all costs herein incurred by defendant International Brotherhood of Electrical Workers, Local 2152, be and the same are hereby taxed against the plaintiff, for which let execution issue.

It is further CONSIDERED and ORDERED that defendant Wiregrass Electric Cooperative, Inc.'s motion for summary judgment, which the court *construes as a motion for partial summary judgment*, be and the same is hereby GRANTED as to the plaintiff's wrongful termination claim under Title VII and 42 U.S.C. § 1981. The case will proceed as to the plaintiff's Title VII and § 1981 claims against Wiregrass Electric Cooperative for alleged discrimination in hiring and promotions.[9]

court need not determine the merit or lack thereof of said claims, discussed *supra* at footnote 1.